UNITED STATES of America, Plaintiff–Appellee,

v.

Karl Erik NISSEN, Defendant–Appellant.

No. 90–2209
Summary Calendar.

United States Court of Appeals, Fifth Circuit.

April 2, 1991.

395 So.2d at 319. *See also Storey v. Lambert's Limbs & Braces, Inc.*, 426 So.2d 676 (La.App. 1982).

Bill May, Corpus Christi, Tex., for defendant-appellant.

Paula C. Offenhauser, Asst. U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, KING and GARWOOD, Circuit Judges.

PER CURIAM:

Karl Erik Nissen was convicted and sentenced for conspiring, 18 U.S.C. § 371, and violating the Arms Export Control Act, 22 U.S.C. § 2778, and interpretive regulations. He argues that, because of alleged due process violations by the government in the conduct of its investigation, the charges against him should be dismissed. He also challenges the district court's interpretation and application of the guideline covering his offense, U.S.S.G. § 2M5.2. We affirm.

I

United States Customs officials in Corpus Christi, Texas, set up an undercover business called Plane Things, Inc., primarily to ferret out persons dealing in controlled substances and transporting it by aircraft. John Danielson, an individual working undercover for U.S. Customs, was the manager of Plane Things. Two aircraft brokers put Danielson in contact with Nissen's co-defendants, Ronald Arab and his wife. The Arabs and Nissen were attempting to negotiate the purchase of military equipment for export. Nissen, a resident and citizen of Sweden, had come to the United States with a large list of military parts he wished to procure. He gave this list to Arab, who passed it to Danielson, who ultimately passed it to the U.S. Customs case agent, Alonzo Pena. Among other things, the list included C–130 aircraft, various military aircraft parts, Stinger missiles and rifles. Agent Pena determined the parts were on the United States Munitions List, *see* 22 C.F.R. § 121 *et seq.*, that can only be dealt with by licensed exporters. Because of Nissen's foreign citizenship, Pena realized that Nissen could not be licensed to make such exports.

Licenses to sell or trade to Iran military aircraft parts and arms or defense articles from the Munitions List clearly would not be given by the State Department. The licensing requirements include the filing of an end-user certificate, a statement by the applicant attesting to the truth of the designated ultimate user, and of the applicant's intent not to divert the arms from the intended use attached to an application for a State Department license to export munitions. *See* Arms Export Control Act, 22 U.S.C. § 2778, and interpretive regulations, 22 C.F.R. §§ 120–123, 126, and 127. Arab's response to Agent Pena's inquiry whether they would attempt to obtain a

license was that he knew there could be no license for the items Nissen wanted to purchase. Nissen further indicated that he could falsely designate that the military arms destined for Iran were being exported to Malaysia.

At issue here are "venturi heaters," which are used to heat certain control surfaces of the Phantom F–4 two-man fighter aircraft, thus affording proper steerage. This and numerous other parts from the list were identified at trial as subject to State Department licensing. Agent Pena specifically advised Arab during the course of the transactions of the illegal nature of their business and the licensing requirements mandated by law. Arab later testified that he apprised Nissen of this fact. Previously, an attorney with whom Nissen had contact had advised him, before breaking negotiations regarding Mirage fighter jets, that if he were to conduct such business, he would need export licenses and end-user certificates from the destination country. Instead, the defendants determined to work out ways to disguise the true nature of the items they wished to export. At no time did the defendants apply for any licenses.

The defendants procured 13 venturi heaters. These parts apparently are not very large, as Arab personally took them to Frankfurt, Germany, in a carry-on bag, where he met Nissen. The two traveled to Sweden, where Nissen and Arab identified the heaters as "sports equipment" to Swedish customs officials. Nissen then alone transported the heaters to Iran. This delivery of venturi heaters was apparently a preliminary venture by Iran to test the suppliers, Agent Pena and Danielson, and to test Nissen to see if he could get the materials out of the United States and into Iran.

Nissen returned to the United States on another trip to arrange shipment of an entire planeload of equipment. The defendants negotiated for a Boeing 707 at the cost of $315,000, and arranged a transaction for over $4 million in parts. Had everything gone as planned, the defendants wished to follow up with a deal totalling as much as $32.5 million in military parts shipped to Iran. They were, however, arrested when attempting to depart again from the United States.

Count 1 of the superseding indictment charged conspiracy to export military aircraft parts without a license or authorization, in violation of 18 U.S.C. § 371 and 22 U.S.C. § 2778. Count 2 charged knowing and willful exportation from the United States to West Germany and Iran of military aircraft parts without a license or authorization, in violation of 22 U.S.C. § 2778(b)(2) and (c), and 22 C.F.R. §§ 121.1, 123.1, 127.1(a) and (c), and 127.3. Counts 3 through 7 charged knowing and willful transfer, transmittal or transport of instruments and funds from a place outside the United States with the intent to promote violations of the Arms Export Control Act, all in violation of 18 U.S.C. §§ 2 and 1956(a)(2)(A).

After a jury trial, Nissen was convicted on counts 1, 2 and 6; acquitted of counts 3, 4 and 5; and granted judgment of acquittal by the district court on count 7. Count 6 was dismissed upon motion of the government. Nissen was sentenced within the applicable guideline range for counts 1 and 2, receiving 44 months imprisonment, 3 years supervised release, a $10,000 fine, and a $100 special assessment.

## II

### A

■ Nissen contends that the government's conduct during this investigation was so fundamentally unfair as to deprive him of due process, which requires dismissal of the counts against him. He points to conversations between Danielson and the defendants, at which Agent Pena was present, where Danielson said he was unsure of the function of venturi heaters, but that he believed their shipment was lawful. Nissen argues that the government had no justification for failing to correct these misstatements and ambiguities.

■ When considering an entrapment defense arising from a "sting" operation, the critical determination is whether the

criminal intent originated with the defendant or with government agents. *United States v. Duvall*, 846 F.2d 966, 974 (5th Cir.1988). The due process clause also places other limits on improper conduct by law enforcement agents, even as against culpable persons. *United States v. Arteaga*, 807 F.2d 424, 426 (5th Cir.1986). However, a due process violation will be found only in the rarest and most outrageous circumstances. *Duvall*, 846 F.2d at 973. Clearly, the use of informants and undercover agents is permissible in government investigations. *United States v. Alvarado–Machado*, 867 F.2d 209, 211 (5th Cir. 1989). That a defendant may have been targeted without sufficient evidence of any predisposition to commit the crime under investigation has been prohibited by this Circuit only where the government employs a contingent fee informant and directs him to implicate specific persons. *Duvall*, 846 F.2d at 974.

Nissen and Arab were the moving force in these negotiations. Far from being specifically targeted by the government, it was they who initiated contact with Danielson at Plane Things, having already prepared a list of military items they wished to acquire. While Nissen complains about ambiguities allegedly present in several conversations, including the function of the venturi heaters, the record reflects that these were preliminary negotiations identifying the parameters of their bargain. In any event, all parts subject to use on the F–4 Phantom are subject to licensing requirements. *See* 22 C.F.R. § 121.1 (category VIII(j)). The evidence from over 600 taped conversations overwhelmingly demonstrates both knowledge and intent by Nissen to supply arms and munitions illegally to the Iranian government. Agent Pena testified that Nissen suggested using the venturi heaters as a test sale to enhance his credibility as an arms supplier because it is difficult to acquire. Arab testified that he knew an export license was necessary to export the heaters out of the United States, and that he had apprised Nissen of this fact. Arab specifically testified that "every time it came up as to the legality of it [exporting the venturi heaters] Mr. Nissen said there were ways around the problem."

Nissen's brief concedes the above facts, but implores us to consider the government's conduct in a vacuum. However, the threshold question regarding entrapment is the defendant's predisposition to commit the crime, which has been abundantly demonstrated. Allegations of outrageous government conduct are similarly unavailing where the defendant is actively and willingly participating in the criminal conduct leading to his arrest. *United States v. Kaufman*, 858 F.2d 994, 1002 (5th Cir. 1988); *Arteaga*, 807 F.2d at 427 ("[T]he outrageous-conduct defense requires not only government overinvolvement in the charged crime but a passive role by the defendant as well."). Accordingly, Nissen's claim of a due process violation is meritless.

### B

The guideline applicable to Nissen's offense is U.S.S.G. § 2M5.2. While this guideline was amended effective November 1, 1990, at the time of Nissen's sentencing, § 2M5.2 provided for a base offense level of 22 "if sophisticated weaponry was involved." Otherwise, the base offense level was 14. The district court reasoned that, even though the venturi heater is not in itself a sophisticated weapon, sophisticated weaponry was involved—the F–4 Phantom aircraft for which the heater was designed. The district court chose the base offense level of 22 for Nissen's crime.

Nissen argues that this choice was error. He points out that the term "sophisticated weaponry" is not defined. As such, he argues that the two-tier classification set up by the United States Munitions List, 22 C.F.R. § 121 *et seq.*, pursuant to provisions of the Arms Export Control Act, 22 U.S.C. § 2778, should be adopted to interpret this term. As interpreted, "sophisticated weaponry" would then be those items designated on the Munitions List as "significant military equipment." *See* 22 C.F.R. §§ 120.19(a), 121.1(b). He concludes by demonstrating that the items listed in the indictment are in Category VIII(j) of the

Munitions List, and are not designated as significant military equipment. The F–4 Phantom itself, listed in Category VIII(a), is so designated.

Before turning directly to interpretation of this term, we note that the only decision to analyze § 2M5.2, either before or after its amendment, is an unpublished district court decision. *See United States v. Behrmann*, No. 89–0445 (D.D.C. May 10, 1990) (available at 1990 U.S.Dist. LEXIS 5658). In *Behrmann*, the district court was squarely faced with construction of the phrase "if sophisticated weaponry was involved" as applied to five gyroscopes capable of both military and non-military application. The district court ruled that the guideline was ambiguous, and that the rule of lenity demanded construction in favor of the defendant. *See United States v. Batchelder*, 442 U.S. 114, 121, 99 S.Ct. 2198, 2202, 60 L.Ed.2d 755 (1979); *Bifulco v. United States*, 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980). The district court went further, noting that the government failed to prove by a preponderance of the evidence that the gyroscopes in question were "sophisticated weaponry"—however that term was to be defined—or that sophisticated weaponry was either involved or was closely linked to the gyroscopes. The district court found instead that the only known use of the model gyroscope involved was the stabilization of antennas on vessels used to track launches from the Kennedy Space Center.

That is not this case. The government's proof demonstrated that the venturi heater is designed as a structure control item located in the vertical fin of the F–4 Phantom, its purpose being to protect the air pressure flowing through the vertical stabilizer. The heater reduces the possibility of ice forming at high altitudes that would cause blockage of the stabilizer, which would cause failure of the aircraft's steering mechanism. Because the venturi heater ensures proper steerage, it is integral to the fighting effectiveness of the F–4 aircraft. Any definition that could reasonably be given to the term "sophisticated weaponry" would include the Phantom F–4 fighter aircraft. Clearly, then, the heaters

were "involved" in a tangible way with "sophisticated weaponry," as required by the guideline to assess a base offense level of 22.

The amendments made to this provision buttress our analysis. No definition or guidance of any sort originally accompanied this guideline to interpret the term "sophisticated weaponry." However, when § 2M5.2 was amended, this term was deleted. The base offense level is now ascertained as:

(1) 22, except as provided in subdivision (2) below;

(2) 14, if the offense involved only non-fully-automatic small arms (rifles, handguns, or shotguns), and the number of weapons did not exceed ten.

U.S.S.G. § 2M5.2 (as amended November 1, 1990). The amended application notes now make clear that this guideline "assumes that the offense conduct was harmful or had the potential to be harmful to a security or foreign policy interest of the United States." U.S.S.G. § 2M5.2, comment (n.1). Application note 2, prior to amendment, stated:

In determining the sentence within the applicable guideline range, the court may consider the degree to which the violation threatened a security interest of the United States, the volume of commerce involved, the extent of planning or sophistication, and whether there were multiple occurrences.

U.S.S.G. § 2M5.2, comment (n.2). The only change to this commentary was to insert the phrase "or foreign policy" immediately before the word "interest." U.S. SENTENCING COMM'N, *Guidelines Manual* app. C, at C.186 (Nov.1990).

■ The Sentencing Commission indicated that "[t]his amendment revises this guideline to better distinguish the more and less serious forms of offense conduct covered." U.S. SENTENCING COMM'N, *Guidelines Manual* app. C, at C.186 (Nov.1990). We view this amendment as making no substantive changes to either the guideline itself or to its commentary. Since it was intended only to clarify this guideline's ap-

plication, we may consider the amended language, even though it was not effective at the time of sentencing for the offense in question. *United States v. Aguilera–Zapata*, 901 F.2d 1209, 1213–14 (5th Cir.1990).

Application note 2 indicates that the higher base offense level was available in Nissen's case. Supplying a device that ensures smooth steerage of a fighter jet clearly implicates a security interest of the United States, particularly when the country targeted for the export is one such as Iran. Nissen's lengthy negotiations and travel demonstrate that he extensively planned this venture, contemplating numerous exports of a high volume of military parts. Furthermore, the amendment makes clear that the lower base offense level is reserved for truly minor exports of military equipment. Both the criminal statute and the applicable guideline presume that the offense was at least potentially harmful to the United States. Furthermore, any interpretation requiring the item exported to be in and of itself a complete weapon would allow offenders to escape prosecution simply by breaking down the weapons into their component parts for shipment. *See Behrmann, supra.* We find any such argument to be untenable.

The district court's finding that export of the venturi heaters "involves sophisticated weaponry" was not clearly erroneous. The base offense level of 22 was properly imposed for Nissen's crime.

### III

The judgment of the district court is AFFIRMED.