**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Abdelkader HELMY, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James E. HUFFMAN, Defendant-Appellant.**

Nos. 89-10659, 89-10662.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 12, 1991.

Decided Oct. 28, 1991.

As Amended on Denial of Rehearing and Rehearing En Banc Jan. 21, 1992.

Richard Dangler and Dale A. Drozd, Blackmon & Drozd, Sacramento, Cal., for defendants-appellants.

Thomas E. Flynn, Asst. U.S. Atty., Sacramento, Cal., for plaintiff-appellee.

Before GOODWIN, THOMPSON and O'SCANNLAIN, Circuit Judges.

GOODWIN, Circuit Judge:

Defendants–Appellants Dr. Abdelkader Helmy and James E. Huffman appeal their respective sentences. Helmy appeals his sentence of forty-six months in prison, a fine of $358,690.00, and a three year period of supervised release following his guilty plea to a one count violation of the Arms Export Control Act ("A.E.C.A."), 22 U.S.C. § 2778. Huffman appeals his sentence of forty-one months in prison, a fine of $7,500, and a three year period of supervised release following his guilty plea to a one count violation of conspiracy to export munitions items without the required license, 18 U.S.C. § 371. We affirm Helmy's sentence and vacate Huffman's.

## FACTS AND PROCEEDINGS BELOW

### A. Course of Proceedings

On June 9, 1989, Helmy pled guilty to illegally exporting 436 pounds of an ablative carbon composite fabric called MX–4926, a critical component in the construction of rocket nozzles, without a State Department license. On June 23, 1989, Huffman pled guilty to conspiracy to export MX–4926, an artificial rubber called HTPB, and two parabolic UHF band rocket antennae.

Both defendants were sentenced on December 5, 1989. The district court determined that both Helmy and Huffman deserved base offense levels of 22 because their crimes involved sophisticated weaponry. *See* United States Sentencing Guidelines ("U.S.S.G.") § 2M5.2 (1989). With respect to Helmy, the court gave him a three point upward adjustment for supervising a criminal activity involving five or more participants. The court also gave Helmy a two point downward adjustment for accepting responsibility, so that his final offense level was 23. Because Helmy had no prior criminal record, his criminal history category was I and his sentence of 46 months—in

addition to his fine and period of supervised release—was the shortest possible under the guidelines.

With respect to Huffman, the court gave him a three point upward adjustment for managing a criminal activity involving five or more participants and a two point downward departure for accepting responsibility. The court also reduced Huffman's offense level by two additional points because it found that giving him three points for being a criminal manager overstated the seriousness of his involvement. Huffman's total offense level was thus 21. Because Huffman had no criminal record, his criminal history category was I and his sentence of 41 months—in addition to his fine and supervised release—was in the middle of the guideline range.

## B. Statement of Facts

In 1984, Egypt's Ministry of Defense entered into an agreement with Iraq and Argentina to develop an intermediate range ballistic missile that would have a range and payload capacity similar to that of the Pershing missile. The missile, referred to as the Condor II, was to be funded by Iraq, tested in Argentina, and engineered by Egypt.

Helmy and Huffman first became acquainted in 1983 while Helmy was working for Teledyne, McCormick, Selph ("Teledyne") as the chief scientist on a gun project and Huffman was the company's midwest marketing representative. In July 1984, Helmy and Huffman went to Egypt, and Helmy arranged for Huffman to meet several Egyptian military officials. Khairat, the coordinator for the Condor II project and a colonel in the Egyptian military, talked with Huffman about purchasing inertial guidance systems for the Condor II.[1]

In 1987 and 1988, Helmy and Huffman conspired to violate the A.E.C.A. and the Export Administration Act of 1979 ("E.A.A."), 50 U.S.C. §§ 2401–20, by attempting to ship commodities on the United States Munitions List, 22 C.F.R. § 121.1 (1989), to Egypt without first obtaining export licenses. The commodities included, *inter alia*, MX–4926, HTPB, and parabolic antennae, all of which are important components of tactical missile systems. In addition to the conspiracy charges, the government claims that certain other materials were purchased by Helmy and flown to Egypt in various shipments.

In early 1988, Col. Khairat arranged to have $1,000,000 wired to Helmy's California bank account to pay for the materials Helmy was purchasing. When Helmy was informed that the procurement effort was proceeding too slowly, he suggested using Huffman to help export the materials because of Huffman's prior experience and earlier efforts on behalf of the Egyptian government. Helmy and Huffman reached an agreement whereby Helmy would cover all the expenses, and Huffman would receive 10% of the gross profits while Helmy would retain 5% of such profits. Huffman, in turn, would be responsible for ordering the materials and arranging for their transportation.

The government claims the shipping method used by Helmy and Huffman was specifically designed to circumvent United States customs laws.[2] By May 1, 1988, Huffman had contacted suppliers of the materials designated by Helmy (including MX–4926 and HTPB), obtained price quotations, and formulated a purchasing plan. Shortly thereafter, Huffman contacted De-Long, the owner of D & N Packing, about receiving, storing, and reshipping several items. Huffman never divulged the identity of the ultimate consignee, and he asked

---

**1.** Colonel Ahmed Hussam Khairat was named as a defendant in the original and superseding indictment, and he has been a fugitive throughout these proceedings.

**2.** For example, in obtaining the artificial rubber HTPB from the Chemical Systems Division of United Technologies ("C.S.D."), Huffman stated in a letter to C.S.D. that the product would be used in a commercial application in Ohio. This letter was written to allay C.S.D.'s concerns about the use and destination of its product. Huffman similarly misled, among others, the manufacturers of two parabolic telemetry antennae and a rocket propellant component called MAPO.

that several items be consolidated into unmarked boxes and that chemical drums be painted black to conceal their identifying markings. When D & N Packing workers refused to paint over the labels, Huffman's son did so. Huffman then mailed nine drums of chemicals aboard Egyptian military transports.

In coordinating the shipment of these materials, Huffman worked with members of the Egyptian Military Attache's Office and the Egyptian Procurement Office ("EPO"). On June 1, 1988, Huffman went to Admiral Abd Elrahin Elgohary, the head of the EPO, to discuss further shipments. Elgohary pointed out the problems inherent in concealing the materials and shipping them without export licenses. After Huffman called Helmy to explain the problem, Helmy spoke with Elgohary and agreed to provide fraudulent invoices to cover the materials.

Helmy then contacted Col. Khairat to discuss the problem. Helmy explained that although Elgohary had tried to insist on export licenses, the desired items were controlled and could not be exported outside the United States. Helmy further stated that if government authorities knew that he was buying the desired items for export purposes, he would be incarcerated. Helmy then explained to Col. Khairat the care he and Huffman had taken to conceal their exports.

Among the critical needs for the Condor II project was a large quantity of the carbon phenolic fabric MX–4926, which is manufactured by the Fiberite Corporation. Helmy intended to obtain this material for use in manufacturing the flexible rocket nozzles that the Condor II missile required for maneuverability. Although appellants claim that certain carbon composite materials are used in a wide variety of contexts, the government contends that the only practical use of MX–4926 is in the construction of rocket nozzles.

Helmy made the initial contacts with Fiberite in early April 1988, and he then asked for information on ablative components. After a meeting with Helmy, Huffman assumed responsibility for obtaining the phenolic fabric. On May 4, 1988, Huffman ordered 436 pounds of MX–4926 from Fiberite; soon thereafter, Huffman mailed a check for $20,949.80 to cover the cost of the material.

In June 1988, Fiberite shipped the material to D & N Packing. The bill of lading that accompanied the fabric and the shipping containers were stamped with notices stating that the contents were subject to export controls. Helmy and Huffman then had several discussions concerning how they were going to smuggle the MX–4926 past Customs and their fears of detection.

Customs agents delivered the MX–4926 to D & N Packing on June 14, 1988. Because the material had to be refrigerated and D & N Packing had no cold storage facilities, Huffman asked DeLong to locate a suitable facility nearby. Upon arrival of the MX–4926, D & N Packing employees took the material to a beer dock. After his initial attempts to arrange for a refrigerated truck to transport the MX–4926 failed, Huffman successfully had the materials delivered to Maryland on June 23, where they were placed in the D.F. Young warehouse. On June 25, D.F. Young employees took the boxes containing the MX–4926 and other materials to a waiting Egyptian C–130 aircraft for loading. Customs agents then seized the materials and arrested Helmy and Huffman.[3]

*ISSUES*

With respect to Helmy, we consider four issues. First, was U.S.S.G. § 2M5.2, which at the time of appellants' sentencing specified a base offense level of 22 where "sophisticated weaponry was involved [in illegal export]," unconstitutionally vague? Second, should this court employ a *de novo* standard when reviewing the district court's application of the guidelines? Third, did the district court abuse its discretion in finding that "fiberite carbonite fabric" is a sophisticated weapon under U.S.S.G. § 2M5.2? Fourth, does the rule of lenity require the district court to apply the lesser base offense level of 14 for ex-

---

**3.** Other conspirators were arrested and then re- leased on grounds of diplomatic immunity.

port of munitions where U.S.S.G. § 2M5.2 is ambiguous?

With respect to Huffman, we also consider four issues. First, did the district court err by applying the higher of the two base offense levels applicable under U.S.S.G. § 2M5.2? Second, did the district court err in its application of U.S.S.G. § 3B1.1(b) when it found Huffman to be a manager and therefore increased his base offense level? Third, did the district court fail to resolve disputed matters in Huffman's presentence report in violation of Fed. R.Crim.P. 32? Fourth, did the district court fail to give Huffman adequate opportunity to present material information at sentencing in violation of U.S.S.G. § 6A1.3 and General Order 225(i) for the Eastern District of California?

*DISCUSSION*

### HELMY

1. Constitutionality of U.S.S.G. § 2M5.2

"Whether a statute or regulation is unconstitutionally vague is a question of law and the standard of review is *de novo*." *United States v. Clark*, 912 F.2d 1087, 1088 (9th Cir.1990), *cert. denied*, ─ U.S. ──, 111 S.Ct. 705, 112 L.Ed.2d 695 (1991) (citing *United States v. Hutson*, 843 F.2d 1232, 1234 (9th Cir.1988)).

■ A statute is unconstitutionally vague when it fails to provide a person of ordinary intelligence with notice of its meaning and the conduct it prohibits. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982)

(quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972)). Vague sentencing provisions may be constitutionally deficient if they do not state with sufficient clarity the consequences of violating the criminal statute in question. *United States v. Batchelder*, 442 U.S. 114, 123, 99 S.Ct. 2198, 2203, 60 L.Ed.2d 755 (1979). The statute must provide explicit standards for those who apply it to prevent arbitrary and discriminatory enforcement. *Hoffman Estates*, 455 U.S. at 498, 102 S.Ct. at 1193.

■ Helmy argues that § 2M5.2 violates due process and is vague on its face because nothing in the guideline defines the term "sophisticated" as it applies to weaponry.[4] First, Helmy claims that the distinction between sophisticated and unsophisticated weaponry is ill-defined.[5] Second, Helmy contends that it would be difficult for anyone reading the United States Munitions List to know that MX–4926 is included in the category that refers to materials which contain carbon. Because carbon is such a common element, he argues that the reference on the munitions list is uninformative regarding whether a particular item, such as MX–4926, falls within the scope of specified items.

Helmy's two arguments are not persuasive. There is evidence that MX–4926's only use is in the production of ballistic missiles. Although Helmy and Huffman did not export a Condor II missile, the materials they exported are closely linked to such production. We believe that § 2M5.2 must apply not only to weapons, but also to weapon components. If compo-

---

4. At the time of sentencing, Section 2M5.2, "Exportation of Arms, Munitions, or Military Equipment or Services Without Required Validated Export License," provided:

"(a) Base Offense Level (Apply the Greater):
 (1) 22, if sophisticated weaponry was involved; or
 (2) 14."
The Guideline was amended on November 1, 1990, and now provides:
"(a) Base Offense Level:
 (1) 22, except as provided in subdivision (2) below;
 (2) 14, if the offense involved only non-fully-automatic small arms (rifles, handguns,

or shotguns), and the number of weapons did not exceed ten."
The Commentary's current Application Notes say that "[i]n determining the sentence within the applicable guideline range, the court may consider ... the extent of planning or sophistication [of the export]."

5. In support of this first contention, Helmy directs our attention to *United States v. Behrmann*, Crim. No. 89–0445, 1990 WL 304063 (D.D.C. May 10, 1990). Because this decision is unpublished, however, Circuit Rule 36–3 prohibits any citation to or discussion of the case. Accordingly, we disregard all arguments pertaining to *Behrmann*.

nents were disqualified under this standard, then offenders could escape punishment merely by breaking weapons down into their individual parts. Tolerance of such facile circumvention cannot be within the ambit of Congress's legislative intent. *See United States v. Fu Chin Chung*, 931 F.2d 43, 46 (11th Cir.1991) (cathode assembly that is part of Hawk missile's guidance system constitutes sophisticated weaponry); *United States v. Nissen*, 928 F.2d 690, 694 (5th Cir.1991) (venturi heater that ensures proper steerage of Phantom F–4 fighter aircraft constitutes a sophisticated weapon).

■ With respect to Helmy's second argument, the A.E.C.A. requires an export license for all articles on the United States Munitions List. 22 U.S.C. § 2778(a)(2). Helmy and Huffman have not denied that the exported materials were specifically intended for use in the construction of the Condor II, and MX–4926 is necessary to construct the flexible engine nozzles required for an intermediate ballistic missile. The State Department has determined that MX–4926 is controlled under Category IV(f) of the munitions list because it is an ablative carbon fiber fabricated or semi-fabricated for missiles. The State Department Office of Munitions Control has specifically found that MX–4926 does meet the munitions list criteria. Thus, Helmy's claim that the guideline is vague insofar as the munitions list fails to specify MX–4926 as a restricted substance is insufficiently supported.

■ Helmy's two arguments are unpersuasive, and we reject his challenge to the constitutionality of § 2M5.2. Because missiles fall within any common sense definition of "sophisticated weaponry" and because the government established that the materials exported here were intended for use as missile components, the guideline is not vague with respect to appellants.

### 2. Standard of Review

■ Assuming § 2M5.2 is constitutional, Helmy argues that we should apply a *de novo* standard of review to the district court's application of the sentencing guidelines. This court "shall give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e). Helmy correctly observes that the statutory language requires this court to determine what degree of factual inquiry is involved in the appeal. Although we review the district court's factual findings for clear error, *United States v. Sanchez–Lopez*, 879 F.2d 541, 557 (9th Cir. 1989), interpretation of the guidelines is a legal question and therefore reviewed under a *de novo* standard. *United States v. Restrepo*, 884 F.2d 1294, 1295 (9th Cir. 1989).

■ Helmy contends that the essential inquiry is legal, not factual, insofar as it involves ascertaining the meaning of a particular sentencing guideline. The government concedes that interpretation of § 2M5.2 warrants *de novo* review, but emphasizes the factual aspects of this case. The district court found that the underlying offense involved a sophisticated weapon, the Condor II missile, and that MX–4926 was itself a sophisticated material. Because the issue of whether a particular item falls within the category of sophisticated weaponry is strictly a factual one, we review the district court's determination of that issue for clear error.

### 3. Sophisticated Weaponry

■ Helmy pled guilty to a single violation of the A.E.C.A., and sentencing guideline § 2M5.2 determines the base offense level for violations of the Act.[6] The dis-

---

6. The Act requires an export license for all articles on the United States Munitions List. 22 U.S.C. § 2778(b)(2). Category IV(f) of the munitions list, 22 C.F.R. § 121.1 (1989), restricts unlicensed export of: "ablative materials fabricated or semi-fabricated from advanced composites (e.g., silica, graphite, carbon, carbon/carbon, and boron filaments) for the arti-

cles in this category that are derived directly from or specifically developed or modified for defense articles." The government alleges that MX–4926 falls within the scope of this category. Helmy argues that the munitions list nowhere mentions MX–4926 or carbon phenolic material. Helmy further observes that MX–4926 is not derived directly from or specifically developed

trict court applied a base offense level of 22 to Helmy because it found that fiberite carbonite fabric qualified as a sophisticated weapon under the guideline.

On appeal, Helmy argues that the district court abused its discretion in finding that MX–4926 is a sophisticated weapon within the meaning of the guideline. Helmy's principal contention is that because the guidelines do not define "sophisticated," it is error to employ the higher base offense level of 22. The district court applied the higher base offense level despite its acknowledgement that sophisticated is undefined. According to Helmy, this application rests on unfounded judicial speculation and controverts the evidence presented.

The government replies that neither defendant denies that the carbon phenolic tape they exported was intended for use in the construction of the Condor II, and that the tape is necessary to construct the missile's flexible engine nozzle. Because the Condor II is capable of carrying large warheads over substantial distances, the government argues that it obviously is a sophisticated weapon under any reasonable definition of the term. *See Nissen*, 928 F.2d at 694 ("Any definition that could reasonably be given to the term 'sophisticated weaponry' would include the Phantom F–4 fighter aircraft.").

. The government also contends that the defendants' pleas acknowledge that the exported items were on the munitions list. The State Department Office of Munitions Control has specifically found that MX–4926 meets the munitions list criteria, and the government claims that this determination is binding on the district court as a matter of law. *See United States v. Spawr Optical Research Inc.*, 864 F.2d 1467, 1472–73 (9th Cir.1988), *cert. denied*, 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989). Because Helmy's plea admitted all of the elements of the offense, the government asserts that he has conceded that MX–4926 is included in the munitions list

and cannot challenge the applicability of those criteria on appeal.

The government points to the amendment of § 2M5.2 as further evidence that fiberite carbonite fabric is a sophisticated weapon that requires imposition of the higher base offense level. *See supra*, footnote 5. To the extent this amendment can be read to clarify, rather than alter, the prior guideline, "[this court] may give it substantial weight in determining the meaning of the existing guideline." *United States v. Ofchinick*, 877 F.2d 251, 257 n. 9 (3d Cir.1989). The Sentencing Commission has indicated that this revision is not intended to change the earlier guideline; rather, it is an attempt "to better distinguish the more and less serious forms of offense conduct covered." U.S.S.G. App. C–186 (1990). Under the amended guideline, Helmy and Huffman's offense would undoubtedly warrant a base offense level of 22. Thus, the government argues that imposition of the higher base offense level under the previous guideline is appropriate. *See Nissen*, 928 F.2d at 694–95 (where amendment is intended only to clarify guideline application and creates no substantive changes, court may consider amended language even though it was not effective at time of sentencing).

The district court's conclusion that MX–4926 is sophisticated would be clearly erroneous only if it were implausible "in light of the record viewed in its entirety." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). As a manufacturer of MX–4926 has explained, the material is specifically designed for use in rocket nozzles. There are only two manufacturers of this material, both of whom are located in the United States, and the Commerce Department considers its export to raise both national security and nuclear proliferation concerns. *See* 15 C.F.R. § 799.1 (1989).

The district court allowed both parties ample opportunity to present evidence on the issue of the material's status as a sophisticated weapon within the meaning of

for defense articles and that it in fact has a variety of non-military uses. We, however,

agree with the government's contention that MX–4926 has only military applications.

§ 2M5.2. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511. The district court's conclusion that MX–4926 is a sophisticated weapon is not clearly erroneous.

### 4. Rule of Lenity

Helmy argues that even if his prior arguments are rejected and this court accepts the district court's determination that MX–4926 is a sophisticated weapon, the rule of lenity requires that an ambiguous criminal sentencing statute be construed in favor of the defendant. The government argues that the rule is inapplicable because § 2M5.2 is clear.

■■■■ "[A]mbiguities in criminal statutes must be resolved in favor of lenity." *Batchelder,* 442 U.S. at 121, 99 S.Ct. at 2203. This rule applies both to interpretations of the substantive ambit of criminal prohibitions and to the penalties they impose. *See Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980); *see also United States v. Burke,* 888 F.2d 862, 866 (D.C.Cir.1989) (applying the rule of lenity to the guidelines). The mere possibility of articulating a more narrow construction of a criminal statute, however, is not sufficient to trigger lenity. *See Moskal v. United States,* — U.S. ——, 111 S.Ct. 461, 465, 112 L.Ed.2d 449 (1990).

This issue turns on whether the term sophisticated has a well-recognized meaning. Helmy points out that the term is undefined in the guidelines and contends that § 2M5.2 must therefore be ambiguous. The government argues that even if classification of certain weapons may be problematic, there is no doubt that intermediate range ballistic missiles and their constituent components are sophisticated.

The government rebuts Helmy's rule of lenity claim on two grounds. First, because ablative carbon phenolic fabric is used only in missile construction, the government argues that the material is obviously a component of a sophisticated weapon. Second, with respect to the sig-

nificance of the guideline amendment, the government notes that the sophisticated/unsophisticated distinction was eliminated in favor of making export offenses such as that involved here qualify for the higher base offense level of 22.

■■■■ We follow the Fifth and Eleventh Circuits in holding that although the term sophisticated is undefined, the higher base offense level may be applied to certain activities. *See Nissen,* 928 F.2d at 694–95; *Fu Chin Chung,* 931 F.2d at 46. We reject appellant's argument that the guideline is so ambiguous that he could only guess as to whether Congress intended to subject those who export intermediate ballistic missile components to a base offense level of 22. *See Ladner v. United States,* 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199 (1958). Therefore, we reject Helmy's rule of lenity argument and conclude that the court imposed the appropriate base offense level.

### HUFFMAN

### 1. Applicable Base Offense Level

Huffman argues the district court erred by applying the higher of the two base offense levels applicable under § 2M5.2. Huffman's contentions are similar to those addressed in the preceding discussion of the rule of lenity. Because the analysis is equally applicable to Huffman, the base offense level of 22 was properly imposed for his crime. Huffman argues that he did not know the materials exported were to be used in weaponry applications, and that such knowledge is required to impose the higher offense level. We do not necessarily agree with Huffman that knowledge is required, but even assuming it is the application of the higher base offense level to him was proper. The district court specifically found that Huffman "knew what the materials were going to be utilized for." This finding is not clearly erroneous.

### 2. Managing a Criminal Activity

Huffman argues that the district court erred in increasing his base offense level based upon a finding that he was a manager of a criminal activity. Guideline section 3B1.1(b) provides that a defendant's of-

fense level should be increased by three points "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive."

The district court found that appellants' criminal activity involved five or more participants. The court, however, believed that a three point upward adjustment would overstate the seriousness of Huffman's involvement and therefore departed two levels downward. The court reasoned that a net one point increase was justified because it was Huffman who ordered many of the materials intended for export and because he used his expertise in deciding where the materials could be obtained, stored, and transported. The district court found that the concealment of the exports required three shipping companies, three storage facilities, at least five knowing participants, and numerous unknowing participants.

 Although we find no clear error in the district court's factual determinations, we conclude that the court incorrectly applied § 3B1.1(b) when it increased Huffman's offense level without determining whether any person with respect to whom Huffman was a manager was criminally responsible. It appears from the record that the district court found that Huffman was a "manager" within the meaning of § 3B1.1(b) solely on the basis of his activities with respect to unwitting suppliers, shippers, and storage companies.

Part B of Chapter Three provides for adjustments to a defendant's offense level based on the defendant's role in the commission of the offense. *See United States v. Anderson*, 942 F.2d 606, 614 (9th Cir. 1991) (en banc). The commentary to § 3B1.4 instructs that "[m]any offenses are committed by a single individual or by

individuals of roughly equal culpability so that none of them will receive an adjustment under this Part." This commentary makes clear that the purpose of Part B is to enable the sentencing court to take account of a defendant's relative responsibility within a criminal enterprise. *See United States v. Bierley*, 922 F.2d 1061, 1065 (3rd Cir.1990); *United States v. Backas*, 901 F.2d 1528, 1530 (10th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 190, 112 L.Ed.2d 152 (1990); *United States v. Gordon*, 895 F.2d 932, 935 (4th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 131, 112 L.Ed.2d 98 (1990).

 Consistent with the purposes of Part B, we hold that in order for a defendant to receive an adjustment under § 3B1.1(b) for his role as a manager or supervisor, the defendant must have managed or supervised at least one other participant—that is, a person who was criminally responsible for the commission of the offense.[7] Absent such a requirement, a sentencing court would be free to increase the offense level of the defendant who had the most subordinate role in a criminal activity merely because that person ordered supplies or directed the actions of unwitting outsiders.[8]

We therefore must vacate Huffman's sentence and remand to the district court for a determination whether Huffman in fact managed or supervised anyone who was criminally responsible for the underlying offense.

3. Violation of Fed.R.Crim.P. 32

 Huffman claims that the district court erred in failing to comply with the requirements of Rule 32 of the Federal Rules of Criminal Procedure. Rule 32(c)(3)(D) provides a sentencing court with two ways to deal with disputed statements of fact in a presentence report. The court

---

7. For purposes of this requirement, a person may be deemed criminally responsible even though that person has not been convicted. *See* § 3B1.1 Application Note 1. We do not reach and do not decide whether any of Huffman's unindicted co-conspirators or any of the individuals shielded from prosecution by diplomatic immunity qualify as criminally responsible within the meaning of § 3B1.1.

8. We note that this holding is in accord with the statement in *Anderson* that § 3B1.1(c) requires that the defendant actually lead, organize, supervise or manage someone who was criminally responsible for the commission of the offense. *See Anderson*, at 614.

can make either "(i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing." Fed.R.Crim.P. 32(c)(3)(D); *United States v. Fernandez–Angulo*, 897 F.2d 1514, 1516 (9th Cir.1990) (en banc).

Huffman argues that the district court neither conducted an evidentiary hearing nor issued findings regarding each controverted matter. Huffman correctly notes that the purpose of Rule 32 is to insure that the requirements of due process are met by guaranteeing a defendant adequate opportunity to challenge the information used against him at the time of sentencing. If the district court failed to comply with the Rule, this court must vacate and remand for resentencing. *Fernandez–Angulo*, 897 F.2d at 1516. Similarly, if the district court stated that the controverted matters would not be considered in imposing the sentence, the sentencing record must unambiguously reflect that the court placed no reliance on the disputed information. *Id.* at 1516 n. 2.

The government contends that the court made findings on all facts necessary for setting Huffman's sentence. Huffman's offense level had three components: a base offense level, a net upward adjustment for being a manager, and a downward reduction for acceptance of responsibility. Concerning the base offense level, the court found that the Condor II missile is a sophisticated weapon and that MX–4926 is a sophisticated material. With respect to the net one point adjustment for being a manager, the court ruled that the criminal activity "involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). Concerning the downward reduction, which Huffman does not challenge, the court held that Huffman's acceptance of responsibility was sincere.

In issuing these findings, the court stated that it was not relying on any of the facts challenged by appellant. The court ruled that even if it were to accept all of Huffman's objections, sufficient information would remain to support its findings. Because the court complied with the re-

quirements of Rule 32, we reject Huffman's argument.

### 4. Material Information

■ Huffman claims that the district court failed to comply with U.S.S.G. § 6A1.3(a) and General Order 225(i) of the Eastern District of California, and that his case should therefore be remanded for resentencing. Section 6A1.3(a) states: "When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor...." General Order 225(i) provides:

*Sentencing Proceedings.* At the time set for the imposition of sentence, if there are no material items in dispute, the Court may proceed with the imposition of sentence. If any material dispute remains with respect to the presentence report, the Court shall afford the parties adequate opportunity to present arguments and information regarding that matter. If the Court determines the dispute cannot be resolved without an evidentiary hearing, the case shall be continued for a reasonable period of time to enable the parties to secure the attendance of witnesses and the production of relevant documents at the hearing.

Huffman contends that material disputes remained with respect to the presentence report at the time of sentencing. He argues that contrary to the guideline and the general order, the court prohibited the introduction of additional evidence. He also claims that additional violations of the sentencing procedures, articulated both by other guidelines and other provisions of the general order, require remand.

The government asserts that the district court fully complied with both the guidelines and the general order. The government notes that Huffman filed with the district court a 27–page sentencing memorandum supported by 35 pages of attachments, a 32–page set of formal objections to the presentence report supported by 16 pages of attachments, and numerous letters. At sentencing, the court asked Huff-

man's counsel if there were other materials that were supposed to be before the court, and counsel replied no. The record demonstrates that Huffman's counsel declined a second opportunity to offer additional evidence. The presentence report framed the issues in dispute between the parties, and Huffman not only presented voluminous documentation, but he was also given opportunities to provide additional information. Because the requirements of the guidelines and the general order were satisfied, there was no error on this point.

We affirm Helmy's sentence; we vacate Huffman's sentence and remand for resentencing after the district court makes appropriate findings on the U.S.S.G. § 3B1.1(b) "management" question.

AFFIRMED in part, VACATED in part, and REMANDED.