UNITED STATES of America,
Plaintiff–Appellee,

v.

Robert F. COLLINS and John H.
Ross, Defendants–Appellants.

No. 91–3778.

United States Court of Appeals,
Fifth Circuit.

Sept. 10, 1992.

Julian R. Murray, Jr., Murray, Braden, Gonzalez & Richardson, Ralph Capitelli, Richard A. Bordelon, Kern A. Reese, New Orleans, La., for Collins.

S.C. Garcia, III, Metairie, La., for Ross.

James M. Cole, Deputy Chief, Raymond N. Hulser, Rod J. Rosenstein, Trial Attys., U.S. Dept. of Justice, Crim. Div., Public Integrity Section, Washington, D.C., Harry Rosenberg, U.S. Atty., New Orleans, La., for U.S.

Before KING, JOLLY, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Defendants Robert F. Collins, a United States District Judge of the Eastern District of Louisiana, and John H. Ross, Collins's longtime friend, challenge their convictions for bribery, conspiracy, and obstruction of justice. They also challenge

the district court's calculation of their sentences. Finding no error, we affirm.

## I.

In the summer of 1989, Gary Young was about to be indicted in the Eastern District of Louisiana for his role in a 1985 marihuana importation operation. Two of Young's coconspirators had been indicted, and Young feared that they would implicate him in the operation.

Young's attorney, Frank DeSalvo, informed him that his case would probably be assigned to Collins, as Collins had handled the cases of Young's coconspirators. At this time, Young asked DeSalvo to initiate plea negotiations with the government. He also considered using bribery as a means of solving his problems with the law.

In late August or early September of 1989, a business associate of Young's, John Yemelos, suggested that he contact Ross. Yemelos told Young that Ross might be able to help him bribe Collins. Young was already familiar with Ross, as he had had corrupt dealings with him in the past. On Yemelos's suggestion, Young called Ross in early September to arrange a meeting.

That meeting took place on September 14. Ross told Young that he was very close to Collins and could take care of the matter. Ross was concerned, however, that he had not received the money Young owed him from their last payoff deal—a scheme that involved Yemelos as well. In addition, Ross told Young that he would have to go through Yemelos if he wanted his help.

Young called Yemelos the next day and told him of his conversation with Ross. Young did not hear from Ross again for about two weeks. During this time, Young made up his mind to cooperate with the government and to sign a plea agreement. DeSalvo already had met with federal authorities to discuss the possibility.

Young signed a plea agreement on September 27. At this point, the authorities expected Young to cooperate with regard to drug traffickers.

On September 28, Yemelos contacted Young to set up a meeting for later that day to discuss Ross. Young told DeSalvo that he had been contacted, and DeSalvo contacted the federal authorities. Special Agent Freddy Cleveland of the Federal Bureau of Investigation ("FBI") then contacted Young.

Young told Cleveland that he had been contacted by Yemelos about Ross. He also told him about his prior corrupt dealings with Ross and about Ross's suggestion that he could help him with Collins. Young offered to tape his upcoming meeting with Yemelos, but Cleveland told him that he could not obtain permission to do so on such short notice. Young taped the meeting anyway, without Cleveland's knowledge.

At the meeting, Young asked Yemelos to arrange a meeting with Ross; Yemelos set up a meeting for the next day, September 29. For this meeting, the FBI fitted Young with a hidden recording device.

Young, Yemelos, and Ross met on September 29 in Yemelos's office. In a conversation out of the presence of Yemelos, Young and Ross struck a deal to bribe Collins. Ross confirmed that he could help Young if his case were assigned to Collins, stating that "I want to make sure that he's gonna have the case." Ross promised to "try not to get you any jail time." In exchange, Young agreed to pay Ross $100,000. Ross asked for $5,000 right away and stated that Young could pay in installments, saying "we can start off with 2500." Young promised to get Ross $2,500 in the next week or so. He then paid Ross the $1,400 he owed from their last payoff deal and gave him $100 that was "extra."

Young paid Ross the initial $5,000 in three installments: $2,500 on October 11, $1,500 on October 19, and $1,000 on October 25.[1] Young and Ross also met on October 12, at which time Ross reminded Young that he could help him only if his case were assigned to Collins. Ross stated

---

1. The money was provided by the FBI.

that "our arrangement is based upon getting it into his court" and that "I'm only committed to Collins."

After the October 12 meeting, the FBI referred the investigation to the Public Integrity Section of the Justice Department, as it involved potential wrongdoing by a federal judge. On November 30, the Public Integrity Section notified Fifth Circuit Chief Judge Charles Clark of the allegations against Collins. Chief Judge Clark then assigned Fifth Circuit Judge John M. Duhé to oversee the investigation.

Ross and Young met on January 22, 1990, to discuss the prospect of obtaining help from Collins. In a telephone conversation of February 1, Ross told Young that he had met with Collins on January 29 and that they had had "a nice chat." Ross stated that "I didn't, didn't discuss anything by name or anything like that, I just told him that, ah ... you know, there's a situation. And before it comes up we'll have lunch and all that business."

On March 16, the government activated pen registers and trap-and-trace devices on telephones located in Ross's office at the Regional Planning Commission ("RPC"), his private real estate office, and his home. These actions were authorized by Judge Duhé. On April 5, Young was indicted on three drug-related counts in the Eastern District of Louisiana pursuant to the September 27 plea agreement. The case was randomly assigned to Judge Patrick Carr. On April 25, Young met with Ross and showed him the indictment. Young told Ross that DeSalvo was preparing a motion to transfer the case to Collins. Ross again confirmed that getting the case to Collins was the critical part of the bargain, stating, "That's all I want to happen. That's all I want to know. That's all I want."

Ross also confirmed that he had mentioned the "situation" to Collins, who had told Ross to let him know when the matter would come up. Ross stated that once the transfer motion was filed, "I'm going to see Collins and tell him ... to ask for the case ... well what I mean by ask was, not to refuse to accept the case." Ross told Young that "as soon as you hear that Collins got the case you get on your knees and thank God."

On May 16, Young met with Ross and told him that DeSalvo and Assistant United States Attorney Albert Winters had scheduled a telephone conference call with Collins for the next day, May 17, to discuss whether Collins would accept Young's case. In Young's presence, Ross placed a call to Collins's chambers in New Orleans and talked with his secretary. He asked her to let "Bob" know that he needed to see him the following day.

Later that day, Young again met with Ross and gave him $2,500.[2] Ross told Young, "I'm gonna take him to lunch, and I'm gonna work out some arrangements." Young told Ross that he would get Ross whatever he needed, and Ross responded that "you know what you had agreed to, so I'm working out of that."

The next day, May 17, Ross had lunch with Collins at Pete's Pub at the Hotel Intercontinental in New Orleans. After lunch, Ross called Young and told him that he had had a two-hour lunch with their "friend" who "gave me his direct number so I can call him ... later on this afternoon ... after he's had a discussion with a few people on the telephone."

At 5:36 p.m. later that same day, Collins, DeSalvo, and Winters conducted the scheduled conference call, during which Collins agreed to take Young's case. At 5:47 p.m., Ross placed a call to Collins, using Collins's private chambers line for the first time. Immediately thereafter, Ross called Young to tell him that Collins had accepted his case.

On May 18, Ross told Young that he had made some commitments based upon what Young had told him previously. Referring to Collins, Ross said, "He wants at least 50 percent before ... you know, 50 now and 50 after he does what he's going to do." Ross added, "Let me tell you what I'm doing with him. I'm working on a 50-50, see. So that every time you give me, if

---

**2.** This money also was provided by the FBI.

you give me this, I'm giving him half." Young stated that he could have $20,000 by the following Wednesday, May 23. Ross replied, "Okay. Cause I'm gonna call him and tell him what he can expect." Immediately thereafter, Ross placed a call to Collins's chambers.

At this point, Judge Duhé granted the government's application to place a wiretap on Ross's private office and home telephone lines. The wiretaps became operational on those lines on May 21 and May 22, respectively.

On May 23, Young met Ross in his RPC office and gave him $20,000 in prerecorded bills; they agreed that Young would pay another $30,000 the following Wednesday, May 30. Soon after Young left Ross's office, Ross dialed Collins's private chambers number six times in two hours. When he finally reached Collins, he said he needed to see him to "talk about the property," adding, "I have an estimate for you." Collins replied, "Oh yeah. Okay, when?" They agreed they would talk again later in order to arrange a meeting.

A couple of hours later, Ross called Collins again. Collins suggested that they meet at Pete's Pub to have a drink. Ross replied, "Uh, I don't have no problem with that, uh, I need, I uh, would I be able, to de—, deliver those estimates to you?" Collins replied, "Yeah ... Yeah, I'm sure."

About ten minutes later, the two met at Pete's Pub. Ross was carrying a brown folder, which Ross placed between them on the table. They talked for about one-half hour; neither touched the folder. When they got up to leave, Collins took the folder with him.

Ross and Young met the next day, May 24, at which time Ross described his meeting with Collins "over in Pete's Pub last night." Ross said that Collins wanted Young to get letters from people who would say favorable things about Young; these would "justif[y] his action" in sentencing Young. Ross also told Young that Collins wanted him to act "scared to death" at his plea hearing. He added that Collins warned Young to "keep his mouth closed," as a light sentence could look suspicious.

He stated that Collins "might even be scrutinized about it." Finally, Ross added that Collins did not want anyone to know that "there was any cash involved."

On that same day, Ross leased an anonymous safe deposit box at the Security Center, a private commercial storage facility that rents both anonymous and named boxes. On May 30, Young gave Ross $30,000 in prerecorded bills; soon thereafter, Ross went to the Security Center. That same day, Young appeared in court before Collins and pleaded guilty to two counts of the indictment. Collins set Young's sentencing for August 8.

That afternoon, Young told Ross that he had thought he was to be sentenced before Collins went on vacation in July and asked Ross to find out why that had not occurred. Later that day, Ross called Collins on his private line and told him that he had thought he was going "to try to dispose of that property before going on [his] vacation." Collins stated, "No, I don't think I could ... work it out," adding that he needed to talk to Ross. Ross told Collins, "I hope there's no problems with the property." Collins responded, "No, I don't think so," but added, "I don't know."

The next day, May 31, the New Orleans *Times–Picayune* ran an article that described Young's plea. Also on that day, the government received authorization to install a pen register and trap-and-trace device on Collins's private chambers line; on June 1, the government received permission to place a wiretap on that line.

On May 31, Ross and Collins met in the lobby of the Hotel Intercontinental, where they talked for about an hour. On June 4, Ross told Young that Collins did not like the article because it mentioned how much time Young had served for a previous offense, and Collins thought this would make it more difficult to be lenient. Ross assured Young that Collins was "just expressing a few concerns." On June 8, Ross again brought up Collins's reservations about the article. Ross stated that the article meant that Collins "has to look at his tactics and, and strategies a lot differently." In this context, Ross told Young

that Collins wanted to see a letter from the United States Attorney's office recommending leniency for Young. There was no known contact between Ross and Collins from May 31 to August 6.

The United States Probation Office prepared Young's presentence investigation report ("PSI"), a confidential document, the first week of August. The PSI recommended eight years' imprisonment, noting Young's prior conviction and forty-month sentence. This "recommendation" section is intended to be seen only by the sentencing judge. The PSI also contained details of Young's personal and financial affairs.

On August 6, Ross called Collins on the private line, saying he had an "upper estimate on the balance" in connection with the "act of sale" he had been "trying to get passed" for Collins. Ross told Collins that "if my figures are right," the balance was "around ten." Collins responded, "Yeah." The two agreed to meet for lunch the next day to "go over the figures again." Ross told Collins that he would bring "that information" with him so Collins could look at it.

A few minutes later, Ross called Young and said he was going to "meet my friend for lunch tomorrow.... So I need to see you before then." Ross also stated that "I'm supposed to take certain information to him tomorrow.... So he can review it."

The next day, Young met Ross at about 11:30 a.m. Ross asked whether he had brought the money; Young said that he had not. Ross said, "I was trying to tell you yesterday evening that's what to do. That's why I go a meeting with him today—to take him the money." Young told Ross that he had agreed to make the final payment after sentencing and asked why the plan had changed. Ross said, "I guess he wanted to make sure that he got his money." Ross asked Young whether he could get "at least 10" immediately; Young said he could, and left.

Young returned at about 12:30 p.m. with $11,000 in prerecorded bills in a brown folder. After Young left, Ross called Col-

lins and told him, "I just had to wait to get something." The two met shortly thereafter at the St. Charles Restaurant. Ross arrived carrying the brown folder; Collins left with it.

Ross and Young spoke on the phone later that evening and discussed Ross's meeting with Collins. Ross revealed to Young several details from Young's PSI that Collins had revealed to Ross. Ross referred to "a certain part of the report that you don't get ... that's confidential" and told Young that the report recommended an eight-year sentence. Ross told Young that this recommendation was "cramping [Collins's] style" and that "he's got to be able to do something to justify this." Ross stated that Collins could not go below his forty-month previous sentence without a letter from the United States Attorney's office.

At around 5:00 p.m. that day, Collins called Winters, asking where Young's "letter of cooperation" was; Winters told him there would be no letter because Young had not cooperated.[3] Collins pressed Winters on the matter; Winters repeated that no letter was forthcoming. Winters testified that it was highly unusual for the sentencing judge to contact him in this manner prior to sentencing, stating that it had never happened to him during eighteen years as a prosecutor.

On August 8, Collins sentenced Young to forty-two months' imprisonment, less than half the PSI-recommended sentence. Ross called Young later that day and told him that Collins had said, "If I had done anything else ... I would've been investigated because I, I can't justify giving you less time than you had the last, the first time ... unless the U.S. Attorney's office ask[s] for lenience." Ross then added that Collins had said that without the letter of cooperation, "all I could do right then was ... add two months ... to the first sentence, 'cause no way in hell I could justify ... giving you less time your second time than the first time." Ross told Young that they had "saved" him five years already

---

3. Specifically, Winters told Collins that Young was not able to "cooperate" with law enforcement officials because all of the "subjects" of his cooperation had already been convicted; thus, any "cooperation" he could offer would be of no value.

and that he would "start tomorrow trying to see what else we can do" to get the sentence reduced.

The following day, Young and Ross met and discussed the contents of the PSI. Ross said, "He was supposed to give you eight years man," and "he deviated from the recommendation substantially." Ross then said, "The Judge then told me, John, I did the very best I could without getting myself and you and everybody else in trouble." According to Ross, Collins had stated that he added two months to Young's previous sentence "to make it seem like I'm doing a legitimate thing." Ross then stated that Collins had "earned his money.... You got a good deal."

Young told Ross that DeSalvo had mentioned filing a motion to reduce his sentence. Ross said that he would check with Collins about it and added, "I believe I can get him to say yeah, I'll do a [Fed. R.Crim.P. 35], just give me the justification."[4] Ross then stated, "I wanna keep this Judge happy" and reminded Young that he still had to come up with the balance remaining on their $100,000 agreement. He said, "if [Collins] can make it easier for you there, he can also do something to probably make it harder on you." Ross stated that "the money part is thirty-one five" and told Young, "Try to have it tomorrow. Let's keep him happy," so that "when I go talk to him, I can have it."

The following day, August 10, Young met with Ross briefly in his RPC office and gave him $31,500 in prerecorded bills. Ross then called Collins's private chambers line and asked whether he could come over and "rap ... a little bit." Collins agreed. Ross met with Collins that day at about 11:00 a.m. After the meeting, Ross gave Young specific instructions from Collins as to how to proceed with regard to reducing his sentence.

That afternoon, the FBI executed search warrants of Ross's person and his RPC office, real estate office, and box at the Security Center and search warrants of Collins's person, his car, and his private office in his chambers. These search warrants had been issued by Judge Duhé and Chief Judge Clark.

The sequence of events was as follows:[5] The FBI had hoped to serve the warrants on Collins in his chambers. When he left unexpectedly, the agents followed his car and stopped him at the first red light about two blocks from the courthouse. One of the agents approached the driver's side, identified himself as an FBI agent, and instructed Collins to exit the vehicle. Another agent told Collins that they had search warrants for his person and his car. Collins asked the agents "[w]hat was this about," and they responded that he would find out in a few moments. The agents then moved the car to the curb.

Cleveland arrived shortly thereafter and identified himself as an FBI agent, telling Collins that he was not under arrest and that the agents could execute the warrants on the street or could move to a more private location. Collins said he would prefer to return to his chambers for the search of his person.

Cleveland stated that the search of the car could be conducted on the street or at the courthouse; Collins responded that neither place would be appropriate. Cleveland then suggested that the car could be taken to the FBI garage and searched; Collins agreed to this arrangement. Cleveland told Collins that the FBI agents would transport him back to the courthouse. Collins collected his coat from his car and got into the back seat of the FBI vehicle.

On the way to the courthouse, Cleveland identified himself by name. Collins asked what the search was about. Cleveland in-

---

4. For offenses committed prior to November 1, 1987, Fed.R.Crim.P. 35(b) provided that "[a] motion to reduce a sentence may be made, or the court may reduce a sentence without motion, within 120 days after the sentence is imposed or probation is revoked...."

5. Collins complains that the facts surrounding the execution of the search warrants were "sanitized" in the FBI reports; he also complains that the district court's hearing on the suppression motion somehow was inadequate. Collins makes no legal arguments addressing these matters; thus, we find that he does not raise them as issues on appeal.

formed him that there were allegations that he had taken monies in relation to Young's sentencing. When Cleveland mentioned Ross, Collins said that Ross was an old friend who had called him with regard to Young in order to let Collins know that Young was a good person. Collins stated that this sort of a call to a sentencing judge was not unusual. Collins also claimed he had accepted no money from Ross with regard to Young or for any other reason and that he had no business dealings with Ross.

When they arrived at the courthouse, Cleveland and Collins went to his chambers. Collins asked Cleveland what the probable cause was for the search. Cleveland stated that federal agents had seen him meeting with Ross and that communications between them had been intercepted. Collins then said he would like to consult an attorney, and all questioning stopped; Cleveland told him he was free to leave.

Before Collins left, Cleveland served him with a subpoena directing him to produce documents concerning any financial dealings with Ross. Collins read aloud the subpoena requests, then stated that he had no records of financial dealings with Ross because he had had no such dealings with Ross. Cleveland also asked Collins to empty his pockets; in Collins's wallet, the agents discovered $180 of the May 23 payment.

When the agents executed the search warrant of the chambers, they discovered $16,000 in cash in a credenza: $6,000 from the May 23 payment and $10,000 from the August 7 payment. After giving Collins a receipt for the monies they seized, the agents left.

On the same day, two FBI agents went to Ross's RPC office to interview him and to execute the search warrants of his office. When they arrived, they identified themselves as FBI agents to the receptionist and asked to see Ross. The receptionist went to the back of the office. When she returned, she told the agents that Ross was on the telephone and would be with them shortly. The agents waited for about five minutes, then asked to see Ross immediately. The receptionist guided the agents down the hallway, where they met Ross.

Once in Ross's office, the agents informed Ross that they needed to speak with him about allegations of attempted bribery of Collins. The agents told Ross he was not under arrest. The agents asked whether he had any recent financial dealings with Collins; he said he had none. The agents then informed Ross that they had evidence, including tape recordings, that Young had worked through him to obtain a low sentence from Collins and that Young had given him large sums of cash.

Ross stated that he had contacted Collins with regard to Young but denied ever having received large sums of cash from Young or having given large sums of cash to Collins. The agents also advised Ross that he could be charged with a number of felonies based upon the evidence. They then showed Ross a number of photographs of his meetings with Collins.

When Ross stated that he wanted to see an attorney, the agents stopped questioning him [6] and produced, for his inspection, the search warrant for his office. Ross then stated, without being asked a question, that he did not understand what was going on and said that Young must have set him up. The agents again stated that they had tape recordings of incriminating conversations. They then reminded him that he had asked for an attorney and that therefore he should refrain from making any more statements.

One of the agents asked Ross to remain in the office while they executed the search warrant; Ross stated that he would rather leave. The agents again stated that he was not under arrest and told him he was free to go. Before he left, he was served with a subpoena requesting certain documents; Ross told the agents that he had

---

6. Ross argues that the agents continued to question him for another 15 minutes. This dispute is not relevant to our decision, as Ross does not seek, on appeal, the suppression of statements he made after invoking his right to counsel; instead, he argues he was in "custody" during the entire encounter with the agents. *See infra* part VII.

no such documents. Ross then was served with a search warrant for his person; when the agents conducted the search, they found $940 of the August 7 payment in his pocket.

When the agents told Ross that they needed someone to remain with them in the office while they conducted the search, Ross called in the receptionist and left soon thereafter. During the search, the agents discovered the full $31,500 payment from earlier that day. The FBI also searched Ross's Security Center box, in which they found $9,380 from the May 23 payment and the full $30,000 of the May 30 payment.[7]

## II.

Collins and Ross were indicted for bribery in violation of 18 U.S.C. §§ 2 and 201(b)(2), obstruction of justice in violation of *id.* §§ 2 and 1503, and conspiracy to defraud the United States in violation of *id.* § 371. At trial, Ross testified that he had received money from Young and had given money to Collins. He claimed that Yemelos had instructed him to accept $100,000 from Young in order to start a legitimate minority business enterprise called "Mahogany, Inc." Ross also testified that he had given Collins the $16,000 found in Collins's chambers as a downpayment on a piece of property that was to be used by Mahogany, Inc. Collins did not testify.

The jury found both defendants guilty. Ross was sentenced to eighty-eight months' imprisonment and Collins to eighty-two months' imprisonment.

## III.

Prior to trial, Collins and Ross filed a motion to dismiss their indictment based upon alleged prosecutorial misconduct. After a hearing, the district court denied the motion.

The defendants' prosecutorial misconduct argument breaks down into three separate issues. First, Collins focuses on the initiation of the investigation, arguing that federal law enforcement officials must have reasoned suspicion that criminal activity is occurring before they can target a federal judge for investigation. Second, both Ross and Collins contend that, taken as a whole, the investigation was so outrageous as to constitute a due process violation. Finally, Ross and Collins argue that they were singled out for prosecution because they are black.

## A.

■ Collins asserts that, because of separation-of-powers considerations, federal judges have "a right to be left alone absent some reasonable suspicion on the part of the Executive Branch of government to believe that some offense has been committed." We recently rejected the proposition that the government "should have reasonable suspicion that an individual is involved in some illegality before targeting him in a sting operation." *United States v. Allibhai*, 939 F.2d 244, 249 (5th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 967, 117 L.Ed.2d 133 (1992).

Collins provides no authority for carving out a "federal judge exception" to *Allibhai*'s general rule,[8] and we decline to create one. As we noted in *Allibhai*,

as a practical matter, investigative agencies rarely expend their limited manpower and resources on a mere whim or in fabricating criminal activity. In circumstances in which an investigation unfortunately ensnares a nonpredisposed indi-

7. In sum, the agents recovered the following: $15,560 of the $20,000 May 23 payment; the full $30,000 of the May 30 payment; $10,940 of the $11,000 August 7 payment; and the full $31,500 of the August 10 payment.

8. At least two circuits have held, however, that separation-of-powers concerns do not justify immunizing federal judges from criminal prosecution as a general matter. *See United States v. Hastings*, 681 F.2d 706, 710–11 (11th Cir.1982),

*cert. denied*, 459 U.S. 1203, 103 S.Ct. 1188, 75 L.Ed.2d 434 (1983) (rejecting defendant's argument that separation-of-powers concerns should prevent executive officers from prosecuting federal judges for acts involving exercise of their judicial power); *United States v. Claiborne*, 727 F.2d 842, 847–48 (9th Cir.) (same), *cert. denied*, 469 U.S. 829, 105 S.Ct. 113, 83 L.Ed.2d 56 (1984).

vidual, the defense of entrapment serves as an effective bar to conviction.

*Id.* This reasoning would apply to federal judges and ordinary persons alike. In addition, judges, like other citizens, are protected against vindictive prosecution. *See Hastings,* 681 F.2d at 711.

Moreover, and perhaps most importantly, a "federal judge exception" would go against the fundamental principle that "[a] judge no less than any other man is subject to the processes of the criminal law." *Id.* In sum, we reject Collins's suggestion that we adopt a federal judge exception to the *Allibhai* rule.[9]

**B.**

■ Both defendants argue that the investigative activity of federal law enforcement officials was so extreme as to constitute a due process violation. They point to the Supreme Court's *dictum* that it might "some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973) (citation omitted). *See also Hampton v. United States,* 425 U.S. 484, 489, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976) (restating *Russell dictum*).

We have acknowledged the *Russell–Hampton*–type theory of a due process

violation but apparently have never invalidated a conviction on this ground.[10] As we repeatedly have held, "a due process violation will be found only in the rarest and most outrageous [of] circumstances." *United States v. Nissen,* 928 F.2d 690, 693 (5th Cir.1991).

The defendants contend that the government acted outrageously because it "align[ed]" itself with Young, "an individual who is obviously and purposefully intent on seeking out members of the black race so he could benefit himself by creating federal prosecutions against them." The defendants point to the taped conversations between Young and Yemelos in which Young repeatedly used a racial slur in reference to Ross and Collins. Young also suggested to Yemelos that given that Ross and Collins were black, "they" could talk to each other.

Although we certainly do not condone Young's language, we can find no due process violation here. The defendants cite no authority for the proposition that the due process clause forbids the government from using individuals of questionable character as informants. To the contrary, it is a common practice accepted by courts.[11]

Moreover, as the government argues convincingly, individuals of questionable character oftentimes make the best informants, as their willingness to engage in criminal activities must be convincing to

**9.** Because we do not adopt such an exception, we need not consider the government's argument that, assuming *arguendo* that "reasoned suspicion" is required, such suspicion existed in this case.

**10.** In fact, there appears to be only one circuit court case, *United States v. Twigg,* 588 F.2d 373 (3d Cir.1978), in which a conviction was invalidated on *Russell–Hampton*–type grounds. We have distinguished *Twigg* on the ground that in that case, the government devised and ran the criminal enterprise with only meager assistance from the defendants. *See e.g., United States v. Tobias,* 662 F.2d 381, 386 (5th Cir. Unit B Nov. 1981), *cert. denied,* 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982); *United States v. Gray,* 626 F.2d 494, 498–99 (5th Cir.), *cert. denied,* 449 U.S. 1038, 101 S.Ct. 616, 66 L.Ed.2d 500 (1980). We also have stated that "[a]llegations of out-

rageous government conduct are ... unavailing where the defendant ... actively and willingly participat[ed] in the criminal conduct leading to his arrest." *United States v. Nissen,* 928 F.2d 690, 693 (5th Cir.1991). Because Collins's and Ross's participation in the criminal activity was "active" and "willing," we find *Twigg* inapposite.

**11.** *See United States v. Reynoso–Ulloa,* 548 F.2d 1329, 1338–39 (9th Cir.1977) (not outrageous for government to employ informant who uses vulgar and threatening language while making drug deals), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978); *United States v. Myers,* 692 F.2d 823, 846 (2d Cir.1982) (no due process violation where government used "dishonest and deceitful" informant), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983).

the other participants. Taken in this context, the defendants' due process rights were not violated by the government's association with Young.

### C.

■ Finally, the defendants contend that the government singled them out for investigation because they are black. The burden on a defendant to show selective prosecution is a heavy one, *see United States v. Ramirez*, 765 F.2d 438, 439 (5th Cir.1985), *cert. denied*, 474 U.S. 1063, 106 S.Ct. 812, 88 L.Ed.2d 786 (1986), as he must meet two requirements. First, he must make a *prima facie* showing that he has been singled out for prosecution although others "similarly situated who have committed the same acts have not been prosecuted." *Id.* at 440 (citations omitted). He then must demonstrate that the government's selective prosecution of him was "actuated by constitutionally impermissible motives ... such as racial ... discrimination." *Id.* (citations omitted). A showing of discriminatory purpose requires the defendant to demonstrate that the government selected or reaffirmed a particular course of action at least in part "because of"—not merely "in spite of"—its adverse effects on an identifiable group. *Id.*

■ At a pretrial hearing, the defendants called Joseph Mohwish to testify. Young's attorney, Frank DeSalvo, had represented Mohwish in a criminal proceeding in Kentucky in April 1990.[12] Mohwish testified that DeSalvo had told him at that time that Young was involved in "set[ting] up" a black politician and that he would receive a sentence of eighteen to twenty-four months because of his cooperation. Mohwish also testified that DeSalvo told him he could get a better "deal" if he could "set up a drug dealer or a black politician." Then, according to Mohwish, DeSalvo asked him whether he knew any black official. He responded that he did not; at that point, according to Mohwish, DeSalvo laughed and said, "Yeah, the government has got them on an endangered species list." [13]

The district court found that Mohwish was not a credible witness.[14] The defendants contend that we should find Mohwish credible because he "had nothing to gain from his testimony." This is not sufficient to overcome the strong deference we give to the credibility decisions of a district court. *See, e.g., United States v. Caldwell*, 820 F.2d 1395, 1401 n. 5 (5th Cir. 1987); *United States v. Pologruto*, 914 F.2d 67, 70 (5th Cir.1990). We therefore do not disturb the district court's determination.

Moreover, the defendants would fall short of meeting their burden even if Mohwish's testimony were to be believed. His testimony traces nothing specific in nature back to the prosecution, as distinguished from DeSalvo. DeSalvo might have thought that Young was "setting up" Collins by "cooperating" with the authorities, but this is not evidence of the intent of the federal authorities (the second *Ramirez* prong).[15] Similarly, nothing in Mohwish's testimony goes toward establishing that the United States Attorney's office was failing to prosecute individuals who had committed acts similar to those committed by Ross and Collins (the first *Ramirez*

---

**12.** Mohwish was convicted and is now serving a lengthy prison term in Atlanta for participating in a continuing criminal enterprise. He also has a previous conviction for mail fraud.

**13.** Mohwish gave substantially similar testimony at trial.

**14.** Mohwish's testimony was contradicted by that of the federal agents, who testified in detail as to how the investigation had proceeded. DeSalvo denied ever having discussed Young's case with Mohwish, although the court found

that his testimony "also raise[d] credibility issues," as he "exhibited uncertainty in some answers and appeared to be eluding others."

**15.** Besides Mohwish's testimony, the defendants return to Young's use of racial slurs. It is simply too far a stretch to argue that because Young made such slurs, the government's decision to investigate and prosecute Collins and Ross was racially motivated. Thus, this evidence, like the Mohwish testimony, does not fulfill the second *Ramirez* prong.

prong).[16] In sum, the defendants fail to meet their heavy burden of making out a *prima facie* case of selective prosecution.[17]

## IV.

██ Prior to trial, the prosecution commissioned a telephone survey of 457 persons in the Eastern District of Louisiana, asking them various questions relating to the upcoming trial. Among other things, the survey asked those polled whether they agreed with the general proposition that "[p]eople accused of a crime ought to have to prove they are innocent." Almost two-thirds of those who responded "somewhat" or "strongly" agreed. Then, after hearing a recitation of the prosecution's version of the evidence against the instant defendants,[18] those polled were asked whether they thought the defendants were "definitely guilty, probably guilty, probably not guilty, definitely not guilty or do you have no opinion in this case." A large majority of those who responded thought they were definitely or probably guilty.[19]

The defendants found out about the survey and reported it to the district court, which in turn ordered the government to terminate all polling and turn over the poll and the results to the court. After reviewing the polling material, the court concluded that the poll was a "red herring" and that nothing had been done to compromise the integrity of jury selection. The court also ordered the defendants to refrain from taking a poll of their own.

In addition, the court refused to turn over the material to the defendants, noting that doing so "would raise issues that would unnecessarily complicate the proceedings." The court stated that it would not release the survey, as it was "concerned that if any details of the survey were publicized at that time, jury selection would be difficult because misunderstandings based upon the results of the poll could taint the entire panel." The court turned the polling materials over to the defendants after trial.

In denying the defendants' motion for new trial, the district court held that the poll had not undermined the integrity of the jury. None of the jurors who served on the jury was contacted, and the court specifically inquired as to this matter in voir dire.[20]

---

**16.** The defendants cite a statistic that 14% of the public corruption cases in the last five years have been against black officials, who comprise only two percent of elected officials nationwide. Again, this evidence does not demonstrate that the government failed to prosecute similarly-situated individuals, and thus it does not satisfy the first *Ramirez* prong.

**17.** The defendants also charge that the government's allegedly outrageous conduct continued throughout the trial; they essentially summarize their arguments pertaining to errors committed during trial and sentencing that are discussed *infra*. Because we find that none of those grounds for error is meritorious, we do not find an "outrageous" pattern of conduct.

**18.** The recitation was as follows:

Judge Collins and John Ross are charged as part of an FBI sting operation in which a man charged with drug trafficking, Gary Young, gave $100,000 to Ross to get his friend Judge Collins to go easy in sentencing Young. The judge and Ross did not know that Young was working for the government. It is alleged that some of the money was used to bribe the judge and that both Judge Collins and Ross had money from Young in their possession when their offices were searched. Based

upon what I have just told you or anything else you may have heard, seen or read about this case, do you think that Judge Robert Collins [and John Ross are] definitely guilty, probably guilty, probably not guilty, definitely not guilty or do you have no opinion in this case.

**19.** The district court described the results of this question as follows:

Fifty-seven percent of those answering the survey knew of the Collins case. Of that 57%, ninety percent (50.8% of the total number surveyed) felt that Collins was probably or definitely guilty, with the vast majority in the "probably guilty" category. Ninety-five percent of those answering (55.6% of the total surveyed) believed that Ross was probably or definitely guilty, again with the vast majority of those in the "probably guilty" category.

**20.** During voir dire, the court asked the venire the following question: "Has anyone talked to you about this case? In other words, has anybody called you on the telephone, anybody trying to poll any of you, make a telephone call to you; talk to you about the case, discuss the case with you in any way?" No one had been contacted by the poll takers.

The court also found that the poll results did not give the prosecution an unfair advantage in selecting a jury or preparing for trial and did not significantly prejudice the defendants. On appeal, the defendants focus exclusively on this aspect of the issue, arguing that the district court "missed the point in concentrating solely on the 'integrity of the jury.'"

We agree that the poll was a red herring and that the defendants' due process rights were not violated. In order to show a violation of due process, a defendant must show that the prosecution's conduct rendered his trial fundamentally unfair. *United States v. Nissen*, 928 F.2d 690, 692 (5th Cir.1991). There was no such fundamental unfairness here.[21]

As for jury selection, the district court found that the prosecution was not able to take advantage of the survey to the detriment of the defendants. We agree. The court ordered the government not to compile or analyze the data. Thus, the government was prevented from compiling a "juror profile." Because the raw responses were worthless without the underlying demographic and background information, the government could not pick and choose among jurors based upon the survey information.

The defendants respond that had they known about the results, they would have "pushed harder" for individual voir dire of prospective jurors. They also argue that the district court should have conducted individual voir dire on its own accord. We reject these arguments.

The defendants have made no showing that voir dire was inadequate. The district court asked the veniremembers, as a panel, whether they would be able to render a verdict solely on the evidence presented at trial and the law as described by the court.[22] It also instructed the panel that the government had the burden of proof to establish guilt beyond a reasonable doubt. Finally, the court asked several questions designed to discover whether any venire-members had been influenced by the media or already had formed an opinion on the case.[23] The court found, and we agree,

21. The questions and responses were not particularly useful to either side. The question regarding "proof of innocence" was a "trick" question, as it did not ask those surveyed whether the accused are entitled to a presumption of innocence, but rather whether the accused must prove their innocence.

In another question, when those surveyed were asked whether they agreed with the statement that "[w]hen the government brings a person to trial, he or she is probably guilty of the crime charged," almost 70% "disagreed somewhat" or "disagreed strongly"—precisely the reverse of the response to the "proof of innocence" question.

With regard to the second question, it is important to note that those surveyed were asked to gauge the defendants' guilt or innocence after hearing the prosecution's theory of the case. It is not surprising that respondents would agree that the defendants were guilty, based only upon the prosecution's recitation of the evidence.

22. The district court asked the following:

If you are selected to sit on this case, will you be unable or unwilling to render a verdict solely on the evidence admitted in the trial and the law as I give it to you in the course of my instructions disregarding any other ideas, notions or beliefs about the law that you may have encountered in reaching your verdict?

23. The court posed the following questions:

[D]o any of you recall having read anything about this case, the nature of the charges, any information about the case, read it in the newspapers, heard anything about it on television, anything that you recall having read or heard about the case? ...

[Several prospective jurors responded.]

Those of you who have read something about the case, heard something about it on radio, on television, has anything occurred as a result of that that would prevent you from returning a verdict in this case based solely upon the evidence you hear in Court and the instructions I give to you?

In other words, have you made up your mind about it one way or another? Have you resolved any of the issues? Is there anything that would prevent you from deciding this case based solely upon the evidence you hear in court and the instructions I give you? ...

[Several prospective jurors responded.]

Other than those who have just responded to the last question, do any of the members of the panel have an opinion as to the guilt or the innocence of any of the Defendants or the charges contained in the Indictment at this time or have you ever expressed an opinion as to the guilt or the innocence of any of the Defendants?

[There was no response from the panel.]

that the defendants had failed to make a showing that additional voir dire was needed.

The defendants seem to be contending that had they only known that the community from which the jury panel was drawn might have been biased against them, they would have been more aggressive in voir dire.[24] We can suppose, however, that a defense team usually enters the voir dire process with the assumption that some members of the venire are biased against the defendant and that the aim is to ferret out that bias. Access to the poll results merely would have reinforced this general assumption. We therefore find that being deprived of the poll results did not deprive the defendants of their due process rights in the voir dire process.[25]

The defendants also argue that the government had an unfair advantage at trial. Again, we disagree. As the district court noted,

> [A]lthough a survey of community attitudes may aid a party in deciding what to *emphasize* at trial, our adversarial system with its liberal discovery mechanisms[ ] does not permit a party to "contrive" a conviction that is not based on the evidence. There is no evidence that the Government manufactured or "tailored" evidence based on the survey.

The defendants respond that had they known about the poll results, they would have altered their trial strategy.[26]

Although the defendants might have found the results beneficial in trial preparation, the question is whether being deprived of the results deprived them of due process. They fail to point out how being deprived of the results significantly handicapped them in preparing for trial or conducting their defense. We therefore find no due process violation.[27]

### V.

The defendants also raise a claim under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which prohibits the prosecution from using its peremptory challenges in a racially discriminatory manner. First, they challenge the procedure by which the parties were allowed to exercise their peremptories. Second, they argue that, contrary to the district court's finding, they met their burden of showing discrimination on the part of the prosecution.

### A.

The defendants contend that the district court erred in dismissing the venire before they had an opportunity to create a *Batson* record and in allowing the prosecution to

---

**24.** The defendants also argue that they would have requested a change of venue had they known of the poll results. As we have noted in the past, "[c]ourts have generally felt that voir dire examination is the appropriate mechanism for screening jurors to avoid bias," not change of venue. *United States v. Malmay*, 671 F.2d 869, 876 (5th Cir.1982). Here, as we have noted, voir dire was adequate to ferret out any bias.

**25.** From this it follows that the defendants were not deprived of due process by being unable to consult with an expert as to how to counteract the poll results during voir dire.

**26.** The only specific decision the defendants identify is Collins's election not to testify. They argue that that decision was premised on the presumption that Collins's "right *not* to testify was intact." We fail to see how the survey, which did not contain questions relating to the privilege against self-incrimination, would have had any bearing on Collins's strategy in this regard.

**27.** The defendants make two additional arguments that we find are without merit. First, they argue that the mere taking of the poll violated their due process rights. We decline to hold that all government-sponsored polls are *per se* unconstitutional; rather, we find that in this particular case, there was no constitutional violation.

They also argue that we should apply the "analogous" *Brady* doctrine to hold that the court should have ordered the government to give them access to the poll results. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), holds that suppression by the government of material exculpatory evidence is a violation of due process. But the poll results were not "evidence," *see Jones v. Butler*, 864 F.2d 348, 355 (5th Cir.1988), *cert. denied*, 490 U.S. 1075, 109 S.Ct. 2090, 104 L.Ed.2d 653 (1989), and thus the government was not under an obligation to disclose them.

put its justifications for its strikes on the record two days after the jury was impaneled.

### 1.

■ Following voir dire, the court informed the parties that each side was to exercise its peremptories all at once and not in view of the other side. The defendants lodged the following objection:

> We want to note an objection to the Court's method of allowing each side to strike the jurors and the reason we do that is it relates to the *Batson* decision, Judge. We feel that when each side is required to exercise their challenges altogether without the other side seeing them and without the challenges being able to be evaluated vis-a-vis what the other ones are doing, we think [it] destroys part of our ability to make any meaningful *Batson* challenges.

The court stated that it saw "no need to challenge the method of selection." The court then called for a brief recess, and the two sides exercised their peremptories.

When court resumed, the jury was selected and seated in the jury box. The court asked each side whether the jury was acceptable. Collins's counsel stated that it was, "[s]ubject to the matters we discussed with the Court that we can put in the record later." Ross's counsel adopted Collins's counsel's statement. Thus, the defendants did not seek to create any further record, the jury was sworn in, and the venire was dismissed.[28]

The defendants now contend that they were not given an adequate opportunity to create a *Batson* record prior to the dismissal of the venire, citing *United States v. Dawn*, 897 F.2d 1444, 1448–49 (8th Cir.) ("the district court, before the venire is dismissed and the jury is sworn, must give the defendant a reasonable opportunity" to create a *Batson* record), *cert. denied*, —— U.S. ——, 111 S.Ct. 389, 112 L.Ed.2d 400 (1990).[29] They argue that additional voir dire would have enabled them to make out a *prima facie* case of discrimination and to carry their ultimate burden of showing discrimination. They explain that they failed to object because, "[f]aced with the prospect of addressing the specific issue in front of the jury or doing so out of the presence of the jury," the latter option was more appealing. According to the defendants, their choice "certainly was not an invitation to the trial court to dismiss the venire a few moments later," and they argue that the court should not have dismissed the jury "knowing that the defendants were going to raise a *Batson* objection."

We reject these arguments. The district court asked whether there were any further objections; there were none, and it dismissed the venire. A district court need not retain the venire when it has not been requested to do so. If the defendants did not wish to raise their *Batson* objections in front of the jury, they could have requested a bench conference or a brief recess. Moreover, the defendants failed to ask the court to recall the venire, even after they made their full *Batson* objection once the

---

**28.** We note in passing that the jury that was finally chosen was approximately 25% black, representing roughly the percentage of blacks in the district.

**29.** Although the defendants complain that they were "hamstrung by the trial court in objecting to the prosecutor's use of peremptory challenges because [they] did not know who was being stricken," they do not argue that the process in and of itself violated their *Batson* rights. Even if we were to consider this issue as properly preserved, however, it is without merit.

The defendants seem to suggest that the court, by requiring each side to exercise its peremptories all at once, prevented them from showing a "pattern" of discrimination. *See Batson*, 476

U.S. at 97, 106 S.Ct. at 1723 ("For example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination."). We disagree. As discussed *infra*, the government provided justifications for its peremptories. It is these justifications that form the basis of a *Batson* challenge. That the government exercised its peremptories all at once would have no effect upon the defendants' ability to cast doubt on these explanations. We also note that the fact that the district court may not have followed the *Batson* procedure as established by certain practice manuals has no bearing on whether defendants' constitutional rights were violated.

jury and venire had been dismissed. Thus, they waived their right to create a record while the venire was present.[30]

### 2.

■ After the jury was seated and the venire had been dismissed, the defendants entered their *Batson* objection and moved for a mistrial.[31] At that point, the prosecution asked for leave of court to place its justifications for its peremptories in the record, presumably at some future date. The court agreed, and the defendants did not object. When the prosecution renewed its offer to place its justifications into the record two days later, Collins's attorney suggested that "[m]aybe we ought to do it at a different time." The matter eventually was taken care of later that day. The defendants now suggest that the two-day delay allowed the government to devise pretextual justifications for its peremptory strikes. But again, the defendants cannot now complain when they failed to object contemporaneously.

### B.

Once a defendant makes out a *prima facie* case of discrimination, the burden shifts to the government to come forward with a race-neutral explanation for its challenges. *United States v. Hinojosa*, 958 F.2d 624, 632 (5th Cir.1992). Although the district court found that the defendants had not established a *prima facie* case, it held a hearing at which the government set forth its reasons and at which the defendants were permitted to respond. After the hearing, the court held that the prosecution's justifications were race-neutral and not pretextual. In this situation, where "the prosecution's explanation is of record," we do not examine whether the defendants established a *prima facie* case; instead, we "review only the district court's finding of discrimination *vel non.*" *United States v. Forbes*, 816 F.2d 1006, 1010 (5th Cir.1987).

■ The defendants focus on the prosecution's striking of potential juror nos. 9, 48, and 56. The government's stated reason for striking no. 9 was that he was employed by a company that was being investigated by federal authorities; because of this, the government felt his objectivity might be compromised. The prosecution struck no. 48 because she was a teacher's aide who helped teach speech therapy; the government suggested that she would be overly sympathetic to the defendants.[32]

---

**30.** The defendants also argue that their objection to the "blind" exercise of peremptories should be sufficient to constitute an objection to the dismissal of the venire. Although the "purpose" behind the first objection might have been to provide a *Batson* record, as would have been the purpose behind an objection to the dismissal of the venire, the fact remains that the second objection simply was not made.

In addition, as the government correctly suggests, it is difficult to see how additional questioning would have aided the defendants in making their case of discrimination. In determining whether the government discriminated against black potential jurors, the focus is on the responses the stricken jurors actually gave during voir dire, not on responses they might have given had they been asked additional questions.

**31.** Collins's attorney stated the following:

We note and the Court can, I believe, take judicial notice that the makeup of black to white jurors in the district is approximately 26 percent. It turned out that the makeup of the jury panel this morning was approximately 26 percent, and interestingly enough, when

various challenges for cause were granted by the Court, the remaining ratio of jurors black to white was approximately 26 percent, but yet out of the eight challenges which the Government was given, six of those challenges were for blacks, so three-quarters of the Government's challenges were devoted to black citizens and one-quarter of the citizens of the District and one-quarter of the jury venire in round figures were made up of blacks and we think that is a prima facie challenge under *Batson*, that the Government's selection of the Jury was in violation of the United States Constitution, and for that reason the Defense, on behalf of Robert Collins, moves for a mistrial.

Ross's attorney adopted the objection and motion, which the district court denied.

**32.** The defendants contend that this was pretextual, as the government did not strike no. 23, a white teacher at the Southern Louisiana Technical Institute. The government responds that it is reasonable to assume that someone who helped disabled children would be more sympathetic than someone who taught at a technical school. The explanation is reasonable.

Finally, the government stated that it struck no. 56 because he was sleeping.

The district court's finding that the prosecution's justifications were not pretextual is entitled to "great deference." *Hinojosa,* 958 F.2d at 632. The court's decision "rests upon a credibility determination, and, thus, we interfere with that decision only if it is clearly erroneous or an abuse of discretion." *Id.*

The reasons given by the government were race-neutral on their face, and the district court found that they were not a pretext for discrimination. We find no error in that conclusion.[33]

## VI.

Henry Lee Smith and Donna Turner were veniremembers and sat next to each other during voir dire. Turner eventually became jury foreman; Smith was not chosen to serve on the jury. According to Smith, during the afternoon break in voir dire, Turner stated that the defendants "need[ed] to go ahead and plead guilty and we can all go home because they look guilty anyway." Smith did not report Turner's alleged statements to the court at that time but apparently contacted defendants' counsel after trial.

At a hearing on the motion for new trial, Smith testified that Turner made the above-described statement and that he believed she was serious. Turner did not testify at the hearing but submitted a handwritten statement denying that she ever had commented on the guilt or innocence of the defendants during voir dire. She also stated that she answered truthfully when asked by the court during voir dire whether she had formed an opinion about

the case. The court denied the motion for new trial.

The defendants argue that Turner's failure to disclose her biases against them deprived them of an impartial jury. Both parties suggest that the analysis as set forth in *McDonough Power Equip. v. Greenwood,* 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), is appropriate in this case. Under *McDonough,* in order to succeed in a motion for a new trial based upon jury misconduct, a party must show (1) that the juror failed to answer a material question honestly on voir dire and (2) that a correct response would have provided a valid basis for challenge for cause. *Id.* at 556, 104 S.Ct. at 850; *United States v. Scott,* 854 F.2d 697, 698 (5th Cir.1988) (applying *McDonough* to criminal context). In evaluating a claim of juror misconduct, we begin with the presumption that the juror is impartial, and "it is incumbent upon the defendant to prove otherwise." *United States v. Wayman,* 510 F.2d 1020, 1024 (5th Cir.), *cert. denied,* 423 U.S. 846, 96 S.Ct. 84, 46 L.Ed.2d 67 (1975).

The defendants contend that they have met their burden. First, they argue that they have shown dishonesty by the fact that Turner failed to respond when the district court asked whether any prospective juror had formed any opinion about the case. Second, they argue that had Turner responded, she would have been struck for cause.

We do not believe the *McDonough* framework is applicable here, as it implicitly presumes a case in which a juror concealed an objective material fact. *See Scott,* 854 F.2d at 699 (juror "conceal[ed]" the "material fact[ ]" that his brother was

---

**33.** *See, e.g., United States v. De la Rosa,* 911 F.2d 985, 991 (5th Cir.1990) (potential juror employed by church-affiliated agency might be more inclined to forgive defendant), *cert. denied,* — U.S. ——, 111 S.Ct. 2275, 114 L.Ed.2d 726 (1991); *United States v. Melton,* 883 F.2d 336, 338 (5th Cir.1989) (juror chewed gum and appeared generally inattentive); *United States v. Moreno,* 878 F.2d 817, 820–21 (5th Cir.) (prosecutor's "gut reaction" that a commercial artist would have sympathy for persons involved with

drugs), *cert. denied,* 493 U.S. 979, 110 S.Ct. 508, 107 L.Ed.2d 510 (1989); *United States v. Lance,* 853 F.2d 1177, 1180–81 (5th Cir.1988) (appearance of inattentiveness); *United States v. Forbes,* 816 F.2d 1006, 1010–11 (5th Cir.1987) (juror had arms crossed and appeared to be hostile to serving on jury); *United States v. Ratcliff,* 806 F.2d 1253, 1256 (5th Cir.1986) (juror fell asleep during jury selection), *cert. denied,* 481 U.S. 1004, 107 S.Ct. 1625, 95 L.Ed.2d 199 (1987).

a deputy sheriff).[34] In cases like this one, where jurors may have made premature expressions as to guilt, we generally defer to the district court's decision as to whether the defendant received a fair trial by an impartial jury, as the court is in "a far better position to judge the mood at trial and the predilections of the jury" than is an appellate court that "ha[s] only an insentient record before [it]." *United States v. Chiantese,* 582 F.2d 974, 980 (5th Cir.1978), *cert. denied,* 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979).[35]

First, the district court must determine whether the juror actually made the statements in question.[36] This determination necessarily requires the court to judge the credibility of the person who allegedly overheard the statement (in this case, Smith). In *Grooms v. Wainwright,* 610 F.2d 344, 347 (5th Cir.), *cert. denied,* 445 U.S. 953, 100 S.Ct. 1605, 63 L.Ed.2d 789 (1980), the mother of the defendant stated that she had heard a juror remark at the close of the prosecution's case that "[a]s far as I'm concerned, [from] what I heard already he's guilty." We held that the district court "was in a good position to evaluate" the mother's credibility and to "observe her demeanor." *Id.*[37]

In this case, the defendants' argument rests on the presumption that Turner in fact did make the statement. The court, however, credited Turner's denial, and we defer to its judgment. Moreover, it credited Turner's statement that she was unbiased and found that the defendants received a fair trial by an impartial jury. We find no reason to disturb that conclusion.[38]

## VII.

 The defendants aver that the district court erred in not suppressing certain statements they made while being questioned by the FBI on August 10. *Miranda* warnings[39] are required only when the defendant is in "custody." *Berkemer v. McCarty,* 468 U.S. 420, 441, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984). We have defined "custody" as follows:

> A suspect is ... "in custody" for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.

*United States v. Bengivenga,* 845 F.2d 593, 596 (5th Cir.) (en banc), *cert. denied,* 488 U.S. 924, 109 S.Ct. 306, 102 L.Ed.2d 325 (1988) (citation omitted).

---

**34.** *See also United States v. Ortiz,* 942 F.2d 903, 909 (5th Cir.1991) (juror's cousin and sister were employees of the United States Attorney's office), *cert. denied,* —— U.S. ——, 112 S.Ct. 2966, 119 L.Ed.2d 587 (1992). *McDonough* was a personal injury case in which a juror failed to disclose that a close relative recently had been injured. 464 U.S. at 550, 104 S.Ct. at 847.

**35.** The situation presented in this case is somewhat atypical, however, as Smith waited until long after the alleged statement was made, and after trial, before contacting defense counsel. In the usual case, the "overhearer" reports the alleged statement to the court immediately. At that point, the court must decide whether and to what extent it should investigate. Our usual task, then, is to review the adequacy of the court's investigation and its ultimate determination that the defendant received a fair trial by an impartial jury. *See e.g., United States v. Webster,* 750 F.2d 307, 336–39 (5th Cir.1984), *cert. denied,* 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985); *Chiantese,* 582 F.2d at 978–80.

**36.** *See Chiantese,* 582 F.2d at 980; *see also United States v. Hendrix,* 549 F.2d 1225, 1229 (9th Cir.) (in considering the effect of a juror's statements as to defendant's guilt, trial court must determine whether allegations against juror are true; if it finds allegations true, it must determine whether new trial is required), *cert. denied,* 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977).

**37.** In *Grooms,* we also noted that the statement, if made, was not reflective of serious prejudice. 610 F.2d at 348. The first aspect of the *Grooms* inquiry—the credibility of the "overhearer"— was an important part of the analysis, however. *See Webster,* 750 F.2d at 338 n. 15 (in *Grooms,* "it was not clear that the juror had in fact made the offending statement").

**38.** *See United States v. Robbins,* 500 F.2d 650, 653 (5th Cir.1974) (trial court entitled to credit juror's denial of bias).

**39.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

It is undisputed that neither Ross nor Collins was under formal arrest at the time; the only question, then, is whether their freedom was restrained to such a degree as to constitute a *de facto* arrest. We agree with the district court that neither defendant reasonably could have understood that his situation was equivalent to that of an arrest.

Both men were told explicitly and repeatedly that they were not under arrest and were free to leave. Neither was arrested at the termination of the interview. As the Eighth Circuit has noted, "[t]he most obvious and effective means" of demonstrating that a suspect has not been taken into custody "is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir.1990) (citing cases).[40]

The defendants respond that even though they were told they were not under arrest, their freedom of movement was restrained during the encounter with the agents. Neither defendant experienced a restraint equivalent to that associated with custody, however.

The only restraint Ross experienced was when the agents searched his person. He was not physically inhibited while the agents were questioning him. In addition, he was told that he was free to leave and indeed did leave while the agents searched his office. This did not rise to the level of a custodial situation.

Collins's movement was restrained more significantly. Collins's car was stopped on the street, and he was escorted to his chambers. But although a temporary Fourth Amendment seizure may have occurred incident to the execution of the search warrants, a Fifth Amendment custodial situation did not. As we noted in *Bengivenga*, although both "seizure" and "custody" speak to restraints of freedom, "[t]he critical difference between the two ... is that custody arises only if the restraint on freedom is a certain degree—the degree associated with formal arrest." 845 F.2d at 598.

The stopping of the car did not rise to the level of custody, as subsequent events immediately dispelled any possibility that a custodial situation would develop. As the district court found,

> Collins was offered several options to avoid embarrassment on the street by the searches and he voluntarily decided that he would rather have the matter taken care of privately. He voluntarily chose to go to his chambers with the agents. He was not commanded to.[41]

Thus, after the car was stopped, the restraint Collins experienced was no greater than that encountered by the defendants in *Mathiason* and *Beheler*, who were asked to come to the police station for an interview.[42]

▮ The defendants also argue that the fact that they were told they were not under arrest and were free to leave was "meaningless" because the agents informed them that the agents possessed incriminating evidence. We disagree.

In *Mathiason*, the police interviewer informed the interviewee-suspect that the police had evidence of his involvement in a crime. 429 U.S. at 493, 97 S.Ct. at 713.[43]

**40.** *See also Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam) (no "custody" where defendant was asked to come down to the police station, was told that he was not under arrest, and was allowed to leave after the police interview ended); *California v. Beheler*, 463 U.S. 1121, 1122, 103 S.Ct. 3517, 3518, 77 L.Ed.2d 1275 (1983) (same).

**41.** Collins gives us no reason to question these factual findings; thus we accept them as not clearly erroneous. *United States v. Harrell*, 894 F.2d 120, 122–23 (5th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 101, 112 L.Ed.2d 72 (1990).

**42.** *See also United States v. Jimenez*, 602 F.2d 139, 144 (7th Cir.1979) (no "custody" where officers curbed suspect's car but did not display a weapon or threaten her physically or verbally).

**43.** The police told the interviewee that they had found his fingerprints at the scene of the crime; in fact this was not true. The Court found that the fact that the police lied to the interviewee had no impact on the *Miranda* custody analysis. 429 U.S. at 495–96, 97 S.Ct. at 713–15.

The Court found that "a noncustodial situation is not converted to one in which *Miranda* applies" simply because "the questioning took place in a 'coercive environment.'" As the Court continued,

Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*Id.* 429 U.S. at 495, 97 S.Ct. at 714. Thus, while it may be true, as Ross argues, that being confronted with adverse evidence or being told that one could be charged with a crime is "designed to p[sy]c[h]ologically overcome [the interviewee's] ability to gather his thoughts and intelligently determine his circumstances," it does not transform the interview into a custodial situation.

We acknowledge that there may be situations in which the defendant is informed that he is not under arrest but where the circumstances suggest otherwise. That did not happen here. We therefore conclude that, based upon the totality of circumstances, the defendants were not in custody.

### VIII.

 In his closing argument, the prosecuting attorney stated the following: "There was already $16,000.00 in [Collins's] chambers. He had already started spending it. And he won't tell anybody what it's for. If it's a real estate deal, tell us." Collins argues that this constituted an improper comment on his failure to take the stand.[44] Additionally, he emphasizes the fact that the prosecutor (1) pointed to him when making the statement; (2) raised his voice when stating his name; and (3) used the present tense.

The test for determining whether a prosecutor's remarks constitute a comment on a defendant's silence is a twofold alternative one: "(1) whether the prosecutor's manifest intent was to comment on the defendant's silence or (2) whether the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence." *United States v. Jones,* 648 F.2d 215, 218 (5th Cir. Unit B 1981) (per curiam).

As to the first possibility, the prosecutor's intent must be "manifest"; in other words, the test is not met "if some other explanation for his remark is equally plausible." *United States v. Rochan,* 563 F.2d 1246, 1249 (5th Cir.1977). As to the second, "the question is not whether the jury possibly or even probably would view the challenged remark in this manner, but whether the jury *necessarily* would have done so." *United States v. Carrodeguas,* 747 F.2d 1390, 1395 (11th Cir.1984), *cert. denied,* 474 U.S. 816, 106 S.Ct. 60, 88 L.Ed.2d 49 (1985) (citation omitted).

The district court found that, taken in context, the remark referred not to Collins's failure to testify but to the implausibility of his trial defense, which was that the money was for a real estate transaction involving Mahogany, Inc. Indeed, a key aspect of the government's case was that when interviewed by the FBI on August 10, Collins and Ross denied having any current business dealings with each other. As the district court put it, the government's argument on this point was that "if the cash was from a legitimate real estate deal (as counsel for both defendants told the jury in opening statements), then why didn't the defendant just say so on August 10?"

---

44. Ross adopts Collins's arguments as to this ground. It is difficult to see, however, how the alleged comment could have prejudiced Ross's rights, given that he testified.

We agree that the prosecutor's comment was not improper when taken in context. Prior to making the allegedly inappropriate statement, the prosecutor repeatedly had referred to the August 10 interviews and to the inconsistency between the defendants' statements at that time and their defense at trial.

The prosecutor started out by giving an overview of the evidence, directing the jury's attention to the testimony of the FBI agents,

> who have told you in no uncertain terms what the defendant said to them on the 10th of August, 1990, when all this cash was found, and they said, ["]I never gave any cash to Judge Collins.["] Judge Collins said[,] ["]I never got any cash from John Ross.["] John Ross said[,] ["]I never got any cash from Gary Young.["] ... Those were lies. About the only truthful thing they said that day was that there were no real estate transactions between the two of them.

Moments later, the prosecutor again directed the jury's attention to August 10, stating,

> Most importantly, let's look at their own word[s]. Both of them were interviewed by the FBI on August 10th, both of them said ["]no real estate deals, none. I don't have one. Haven't had one in three years. Nothing recent.["]

The prosecutor then directed the jury to the testimony of Agent Cleveland, stating,

> When [he] interviewed Judge Collins on August 10th, twice, not once, but twice, Judge Collins told him, ["]I have no real estate deals with John Ross....["] [H]e said: ["]I don't have any records of real estate deals to give you because I haven't had any real estate deals with him. Not records, real estate deals.["]

Soon thereafter, the prosecutor directed the jury's attention to the way in which Collins and Ross discussed the so-called real estate deal:

> Listen to what [the tapes] say about this real estate deal. Listen to the tone.... Judge Collins barely speaks in any of those conversations, "Uh-huh, yeah. Okay." If it's a real estate deal, why

can't he talk? They don't mention any specifics. Everything is vague. They always have to meet to discuss it. They can't ever talk about it on the phone. You hear them talking about estimates to deliver. ["]I have some information to show you.["] Well, ladies and gentlemen, if it[']s going to be cash and money that they are going to give each other, and it's legitimate, and it really is for a real estate deal, why don't they say so?

With the assistance of charts, the prosecutor then took the jury through a timeline of events from September 1989 through August 1990. Once again, he ended up with the events of August 10, stating,

> Finally, the statements to the FBI, ["]no cash.... [N]o real estate transactions.["] That is the true statement they had. If there had really been an innocent real estate transaction going on, why wouldn't either of them have said, ["]Look, yes, I have a real estate transaction. I got some cash from them. We don't have a contract.["] Why wouldn't they say that? Because they hadn't thought of it yet.

At this point, the defendants' attorneys gave their closing arguments, during which they examined the government's case and attempted to draw out any inconsistencies. Collins's attorney explained Collins's statements of August 10 as follows:

> I'm not going to sit here, ladies and gentlemen, to tell you that at some point in that conversation Agent Cleveland didn't say [to Collins], ["]Have you gotten any cash money from John Ross at any time?["] I don't know. My guess is [is that] he probably did get that question in along with all of the questions about the records and the transactions and [the] bribe, and what you end up doing is you say ["]no, no, no, no, I didn't do anything. Why are you doing this to me?["] ...

He then reiterated the explanation:

> And the government wants to tell you, ["W]ell, if he had done nothing wrong I would have expected he would have just given an explanation for everything that had happened.["] They weren't there for

an explanation, ladies and gentlemen. As they said, Judge Collins has been on the bench for 13 years. He has seen these cases. He knows what happens when federal agents come in and they have a search warrant and an instanter subpoena on a federal judge.... They are not there for explanation. They are there to solidify the case. And your reaction is to say ["]I don't know, or no, no, no.["] [45]

Thus, Collins's attorney stressed that because of his experience on the bench, Collins knew what was going on that day—the agents were attempting to "solidify [their] case" against him. According to Collins's attorney, Collins's natural response therefore was to deny everything.

On rebuttal, the prosecutor turned this reasoning around. As noted above, he stated that "[t]here was already $16,000 in his chambers. He had already started spending it. And he won't tell anybody what it's for. If it's a real estate deal, tell us." Then, referring to Collins, he stated,

He is a federal judge for 13 years. He signed search warrants himself for years. He's presided over these trials for years. Are you going to tell me that he isn't capable *at that moment,* if there is a reasonable, innocent, legitimate explanation, from saying ["]Let me tell you what it's all about?["] He knows how the system works. He knows that you can explain. But, no, [Collins's attorney] wants to create out of whole cloth in his

own mind what happened. [Emphasis added.]

The prosecutor therefore was referring to Collins's denial "at that moment" (August 10) that he had had any business dealings with Ross. The prosecutor's argument was that, contrary to Collins's attorney's contention, a judge in Collins's position would not reflexively deny his business dealings with Ross; instead, given his intimate familiarity with the judicial process, he would be eager to provide the authorities with a legitimate explanation for the presence of the money in his chambers.

In sum, the remark was not objectionable, as there was an "equally plausible" explanation other than that it was a comment on Collins's failure to testify. *Rochan,* 563 F.2d at 1249. Moreover, because of this explanation, the jury would not "necessarily" have understood the remark as such a comment. *See Carrodeguas,* 747 F.2d at 1395.[46] We therefore find that the prosecutor did not impermissibly comment on Collins's failure to take the stand.[47]

## IX.

■ Collins argues, in the alternative, that even if the prosecutor was referring to the events of August 10, his remark constituted an impermissible comment on Collins's pre-arrest silence.[48] The circuits appear to be divided on the issue of whether the prosecution may comment on a *non-testifying* defendant's pre-arrest silence.[49]

45. Although Collins faults the prosecutor for using the present tense, his attorney did so as well. As is shown by the passages excerpted *supra,* the prosecutor used the present tense throughout his closing argument.

46. This is true even though the prosecutor may have pointed at Collins while he was speaking and raised his voice while stating Collins's name. These actions reasonably would have been viewed by the jury as the prosecutor's attempt to add emphasis to his argument relating to Collins's August 10 denials.

47. Even if the prosecutor did comment on Collins's failure to testify, it is plain beyond a reasonable doubt that, given the weight of the evidence, the jury would have returned a guilty verdict absent the remark. *See United States v. Kane,* 887 F.2d 568, 576 (5th Cir.1989), *cert.*

*denied,* 493 U.S. 1090, 110 S.Ct. 1159, 107 L.Ed.2d 1062 (1990).

48. Again, we fail to see how Ross could have been prejudiced by the prosecutor's comment. Moreover, it is well established that a prosecutor may comment on a *testifying* defendant's pre-arrest silence in order to impeach him. *See Jenkins v. Anderson,* 447 U.S. 231, 235–40, 100 S.Ct. 2124, 2127–30, 65 L.Ed.2d 86 (1980); *see also United States v. Cardenas Alvarado,* 806 F.2d 566, 572 (5th Cir.1986). Thus, because Ross testified, he could be impeached by his own pre-arrest silence.

49. *See United States v. York,* 830 F.2d 885, 895–96 (8th Cir.1987) (prosecutor may comment on the inconsistency between non-testifying defendant's pre-arrest silence and his trial defense),

We have noted in passing that such comment might be proper, although we have not addressed the question squarely.[50]

We need not reach this question, however, as the prosecutor's comments were directed primarily toward Collins's affirmative statements—his denial of any business dealings with Ross—as distinguished from his silence. Although the prosecution did point out Collins's failure to provide a legitimate explanation for the presence of the money in his chambers, this was merely an inference drawn from the fact that Collins affirmatively had denied having any business deals with Ross.[51] We therefore find that the prosecutor commented on Collins's pre-arrest statements, not his silence, and

that it was proper for the prosecutor to point out the inconsistency between the statements and Collins's trial defense.[52]

## X.

An order authorizing a wiretap, like an ordinary search warrant, must be supported by a finding of probable cause. *United States v. Gonzales*, 866 F.2d 781, 786 (5th Cir.), *cert. denied*, 490 U.S. 1093, 109 S.Ct. 2438, 104 L.Ed.2d 994 (1989). The defendants argue that the application for the first wiretap "completely lacked probable cause" and that therefore all information obtained thereby and by subsequent wiretaps should have been suppressed.[53]

---

*cert. denied*, 484 U.S. 1074, 108 S.Ct. 1047, 98 L.Ed.2d 1010 (1988); *but see United States ex rel. Savory v. Lane*, 832 F.2d 1011, 1017–19 (7th Cir.1987) (admission of evidence of non-testifying defendant's pre-arrest silence was error, but harmless); *United States v. Davenport*, 929 F.2d 1169, 1174 (7th Cir.1991) ("it violates the self-incrimination clause to allow into evidence testimony that the defendant refused to give a statement to the police when first approached by them," citing *Lane* ), *cert. denied*, — U.S. ——, 112 S.Ct. 871, 116 L.Ed.2d 776 (1992). The Seventh Circuit recently limited *Lane*'s scope to those situations in which the defendant is completely silent, as opposed to situations in which the defendant answers some questions and then refuses to answer others. *Davenport*, 929 F.2d at 1174–75. The court also found that if there was error, it was harmless. *Id.* at 1175.

**50.** *See United States v. Cardenas Alvarado*, 806 F.2d 566, 572 (5th Cir.1986) ("if testimony relates to pre-arrest silence, the Constitutional claim has no merit").

**51.** Specifically, on two separate occasions Collins affirmatively denied having any business dealings with Ross. The first was during the ride to the courthouse. The testimony of Agent Cleveland was as follows:

Q: Did [Collins] say anything about whether he had accepted money from John Ross for Gary Young's sentencing?
A: He said he accepted no money at all from John Ross concerning sentencing or any other reason.
Q: Did he say anything about whether he had any business or financial dealings with John Ross?
A: Yes, sir. He said he had none.

The second denial occurred in Collins's chambers. The testimony of Agent Cleveland was as follows:

Q: Did you serve [the] subpoena on him?

A: Yes.

Q: When you gave Judge Collins this subpoena where was he?
A: He was in his chambers.

Q: When you gave Judge Collins the grand jury subpoena what did he do?
A: He read the attachment [that listed the documents requested].

Q: Did he make any response to it?
A: Yes, sir.
Q: What did he say?
A: In reference to the ... second paragraph requesting any and all documents ... concerning the real estate or personal financial transaction [between him and Ross], he said he had no records because none existed as he had none of these.
Q: Had none of these transactions with whom?
A: John Ross.

Collins argues that by referring to the $16,000 and then asking, "Are you going to tell me that he isn't capable *at that moment* ... from saying [']Let me tell you what it's all about[']?" (emphasis added), the prosecutor was "specifically confin[ing]" his commentary "to the scene in chambers" when the money was discovered, as opposed to the ride to the courthouse. From this, Collins argues that "it necessarily follows that the jury would ... assume that [the prosecutor] was referring to the Judge's silence ... in chambers." But, as the above testimony indicates, Collins did make affirmative denials in chambers.

**52.** Again, even if the prosecutor's comments were improper, any error would be harmless. *See supra* n. 47.

**53.** Presumably, the defendants are challenging Agent Cleveland's application of May 18.

The defendants argue that the application for the wiretap was flawed because it (1) lacked "any indicia of reliability" for Young; (2) contained "an abundance of stale information"; and (3) contained "[a]t least one if not more deliberate falsehoods or misstatements." The district court denied the motion to suppress.

## A.

■■■ The defendants essentially argue that the FBI failed to inform Judge Duhé of material facts regarding Young's reliability. They further argue that had Judge Duhé had access to those facts, he would have discounted the information contained in the application that was provided by Young, leaving insufficient information upon which to base a finding of probable cause.

The application stated that Young previously had served a federal prison term for illegal drug offenses and now was cooperating with federal authorities as part of a plea agreement involving "various illegal drug offenses." The defendants argue that the FBI should have included both a more detailed description of Young's prior conviction and the fact that after being sentenced, Young was brought before a federal grand jury to testify under a grant of immunity but refused to testify. The defendants point to no authority *requiring* the agents to provide detailed information about an informant's criminal past (Indeed, wiretap applications are often based upon information from informants whose identity is unknown.), nor do they suggest that the FBI deliberately misled Judge Duhé as to Young's criminal past.

Moreover, there is no reason to think that inclusion of additional information about Young's criminal past would have made any difference. Judge Duhé was informed that Young was a convicted drug dealer and that he now was cooperating pursuant to a plea agreement. This was sufficient to inform Judge Duhé of Young's reliability; the additional information would have been merely cumulative.

As for the omission of the fact that Young had failed to testify in a grand jury

proceeding, this information would have had little or no impact on Young's reliability. Such information would only go to show Young's disinclination to give information to the authorities; here, that was not a problem, as Young was actively cooperating. We therefore reject the defendants' arguments as to Young's reliability.

## B.

■■■ The defendants also assert that the application contained three lies. In order to obtain a hearing on allegedly deliberate falsehoods contained in a wiretap application, the defendant is required to make a substantial preliminary showing that the application contains a false statement made knowingly or intentionally, or with reckless disregard for the truth, and that the statement is necessary for a finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978). The district court found that the defendants did not make this showing.

### 1.

■■■ The defendants first point to the application's characterization of the October 12, 1989, conversation between Ross and Young, which was as follows: "Ross indicated that he could help Young with Collins because of Ross's personal relationship with Collins and also by giving Collins money." We agree with the district court that this was an accurate summary of the Young–Ross conversation.

The purpose of the meeting was to discuss whether Ross would assist Young with his case if it came before Collins. Young had paid Ross $2,500 on the previous day for his services. During the meeting, Ross told Young about his influence over Collins and instructed him to start "accumulating" because "big change" was going to be required. In addition, in the midst of references to money to be paid by Young, Ross stated, "I mean he would do it for that ... he'll do [it] ... for something like that." Ross also stated that in addition to "that," he would be asking Collins for a personal favor.

Considering these statements in the context of the meeting, the application's summary was accurate. Indeed, an experienced agent is permitted to draw reasonable inferences and interpretations of statements in the context of a series of conversations and events. As the district court concluded, Cleveland, who applied for the wiretap, "has been an FBI agent for 19 years, therefore, it was reasonable for him to infer from the conversations on these two days, that defendant Collins was to be given money. This is not a misstatement made in reckless disregard of the truth." We agree.

### 2.

■ The second statement the defendants point to is the following:

> During this [October 12] meeting, Ross told Young that for this assistance with Judge Collins it would take one hundred thousand dollars ($100,000). (Review of the tape recording of this conversation clearly shows that the two men discussed money, but the specific amount is unintelligible; Young has advised [the FBI] that the amount discussed was one hundred thousand dollars ($100,000).)[.]

During the September 29 meeting between Ross and Young, Young stated, "I'll get you a hundred thousand dollars." [54] During the October 12 meeting, Ross confirmed that he previously had discussed a particular figure with Young, stating that "[w]hen you mention th—, that number to me...." A few moments later, Ross stated, "In this case, if you can do what you say you can do, and I'm banking on

that...." [55] Given that the application readily admits that the specific amount was unintelligible on the tape, we conclude that the application did not contain a deliberate falsehood.

### 3.

■ Finally, the defendants focus on a statement in the application that asserts that Ross told Young during their October 12 conversation that Ross had "helped" another defendant who had appeared before Collins. They argue that it was wrong for the FBI to assume in its application that this "help" was illegal. Again, this is a reasonable inference from the conversation and the context of the meeting and does not constitute a deliberate falsehood.

### C.

■ The defendants next argue that the application contained "stale" information. Information may be considered stale if it does not go toward showing "a longstanding, ongoing pattern of criminal activity." *United States v. Webster*, 734 F.2d 1048, 1056 (5th Cir.), *cert. denied*, 469 U.S. 1073, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). In particular, the defendants point to the affidavit's summary of various allegations of bribery and corruption against Collins that were raised during his confirmation hearing before the Senate Judiciary Committee. The affidavit also contained a summary of similar allegations against Collins that arose after he was on the federal bench. [56]

---

**54.** Cleveland became aware of the $100,000 figure months after submitting the wiretap application, at which time the recording of the September 29 conversation was enhanced.

**55.** The defendants argue that money was not discussed, but we believe this is a reasonable inference to be drawn from the statements.

**56.** The affidavit contained the following statements:

> Collins served as an Orleans Parish Magistrate–Judge until he was confirmed as a United States District Judge in May 1978. During the FBI background investigation, there were allegations that Collins was furnished prostitutes and other gifts by some bondsmen and

attorneys in exchange for favorable consideration at bond hearings.... It was also alleged that in 1971 Collins had received part of a forty thousand dollar ($40,000) cash payment used to buy votes for Edwin Edwards in a gubernatorial primary election. After inquiring at length into these allegations, the Senate Judiciary Committee approved Collins' appointment.

> [A]nother FBI file ... reflects an allegation, received in May 1986, that in late 1982 or early 1983 Judge Collins accepted a five thousand dollar ($5,000) bribe to allow an appeal bond to [a] convicted narcotics trafficker.... Investigation failed to substantiate the allegation, and the United States Department of

We need not decide whether the information was "stale," as we agree with the district court that deletion of the information would not have affected the probable-cause determination. The affidavit, as noted above, contained detailed information concerning the conversations between Ross and Young that implicated Collins. If the authorizing judge uses "common sense and bases [his] finding upon the entire picture presented to [him]," the determination is conclusive in the absence of arbitrariness. *Gonzales*, 866 F.2d at 786. We find no such arbitrariness here.

### D.

▆ The defendants also argue that the application failed to meet the dictates of 18 U.S.C. § 2518(1)(c), which requires a wiretap application to include a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." We have held that the purpose of this section "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted." *Webster*, 734 F.2d at 1055. Rather, the section "is designed to inform the issuing judge of the difficulties involved in the use of conventional techniques and to insure that wiretapping is not resorted to in a situation in which traditional investigative techniques will suffice to expose crime." *Id.*

With these considerations in mind, we have held that "[i]t is enough if the affidavit explains the prospective or retrospective failure of several investigative techniques that reasonably suggest themselves." *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir.1978). The application in this case met this standard.

Among other things, it stated that physical surveillance of Ross and others would show that meetings were taking place but would not supply the content of those meetings. It also stated that consensual monitoring (as that used with Young) would be impossible, as it was unlikely that Young was going to be present during the "ultimate illegal activity that is expected to occur" between Ross and Collins. Finally, it stated that it was unlikely that any written records would be kept of the meetings between Ross and others. This is more than sufficient information to meet the requirements of section 2518(1)(c).[57]

### XI.

▆ Ross received the pattern jury instruction for entrapment[58] that has been upheld on numerous occasions. *See United States v. Martinez*, 894 F.2d 1445, 1450

---

Justice's Public Integrity Section declined prosecution because of insufficient evidence.

**57.** As the defendants directly challenge only the first wiretap application, which we find to be sufficient, we need not consider the adequacy of subsequent applications.

**58.** The court instructed the jury as follows:

Defendant Ross has asserted that he was the victim of entrapment. Where an individual has no previous intent or purpose to violate the law, but is induced or persuaded by law enforcement officers, or by their agents, to commit a crime, that person is a victim of entrapment, and the law as [a] matter of policy forbids that person's conviction on such a case. On the other hand, where an individual already has the readiness and the willingness to break the law, the mere fact that the government agents provide what appears to be a favorable opportunity is not entrapment. For example, it is not entrapment for a government agent to pretend to be someone else, and to offer, either directly or through some informer or other individual, the opportunity to engage in an unlawful transaction.

If you should find beyond a reasonable doubt from all the evidence in the case that, before anything at all occurred relating to the alleged offense involved in this case, that the defendant Ross was ready and willing to commit a crime as charged in the indictment whenever the opportunity was afforded, and that the government officers or their agents did no more than offer the opportunity, then you should find defendant Ross is not a victim of entrapment. On the other had, if the evidence in the case should leave you with a reasonable doubt as to whether or not defendant Ross had a previous intent or purpose to commit the offense charged, apart from the inducement or persuasion of the officer or agent, then it would be your duty to find defendant Ross not guilty. The burden is on the government to prove beyond a reasonable doubt that defendant Ross was not entrapped.

(5th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 351, 112 L.Ed.2d 315 (1990); *United States v. Johnson*, 872 F.2d 612, 622 (5th Cir.1989). He contends that the jury should have been instructed that he was maintaining his innocence and in the alternative was claiming that he was entrapped. He bases this argument upon *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988).

*Mathews* holds that the jury must be given an instruction on entrapment when there is sufficient evidence from which a jury could find entrapment, even when the defendant denies culpability for the crime. *Id.* at 62, 108 S.Ct. at 886. *Mathews* speaks to *when* an entrapment instruction should be given, not to *what* that instruction should say. *Mathews* thus is inapplicable, as Ross received an entrapment instruction.

Moreover, the jury repeatedly was told that the defendants were denying culpability; indeed, that was the essence of the trial. It thus was not necessary for the court specifically to tell the jury, in its entrapment instruction, that Ross was denying culpability. *See United States v. Fotovich*, 885 F.2d 241, 242 (5th Cir.1989) (sufficiency of jury charge is determined by looking at the entire jury charge in the total context of trial), *cert. denied*, 493 U.S. 1034, 110 S.Ct. 754, 107 L.Ed.2d 770 (1990).

## XII.

■■■ The defendants challenge the computation of their sentence. The guidelines establish a base offense level of 10 for "[o]ffering, [g]iving, [s]oliciting, or [r]eceiving a [b]ribe," U.S.S.G. § 2C1.1(a), and permit an eight-level enhancement if the offense involves a payment for the purpose of "influencing an elected official or any official holding a high level decision-making or sensitive position." *Id.* § 2C1.1(b)(2)(B).

But sections 2C1.1(a) and (b) do not apply in all cases. At the time the defendants were sentenced, section 2C1.1(c)(1) stated,

> If the bribe was for the purpose of concealing or facilitating another criminal offense, or for obstructing justice in respect to another criminal offense, apply § 2X3.1 (Accessory After the Fact) in respect to such other criminal offense if the resulting offense level is greater than that determined [by using § 2C1.1(a) and (b)].[59]

Section 2X3.1 provides a base level offense of "6 levels lower than the offense level for the underlying offense."

In this case, the "underlying offense"—Young's conviction for importing over 2,500 pounds of marihuana—carries a base offense level of 32. U.S.S.G. § 2D1.1(c)(6). Cross-referencing the accessory-after-the-fact sentence to Young's offense level produces a base offense level of 26, which is greater than the offense level of 18 produced by using section 2C1.1(a) and (b).

The district court utilized section 2C1.1(c)(1) and assigned the defendants a base offense level of 26. It then gave them a two-level enhancement pursuant to section 3C1.1, "Obstructing or Impeding the Administration of Justice," yielding an offense level of 28.[60]

Both defendants argue that the court should not have applied the cross-reference to Young's offense, as that offense took place prior to the effective date of the guidelines (November 1, 1987). In addition,

---

**59.** The defendants were sentenced in September 1991. In November 1991, this section of the guidelines was split into two sections, separating the penalties for "facilitating" another offense (which is now U.S.S.G. § 2C1.1(c)(1)) and "concealing" or "obstructing justice in respect to" another offense (which is now *id.* § 2C1.1(c)(2)). This change is not relevant here.

**60.** Collins explicitly states in his brief that his sentence was enhanced two levels for "obstruction of justice." It appears from the PSI and the sentencing hearing, however, that the two-level enhancement was pursuant to U.S.S.G. § 3B1.3, which permits a two-level enhancement when "the defendant abused a position of public ... trust ... in a manner that significantly facilitated the commission or concealment of the offense." This discrepancy does not affect our analysis, however, as Collins's only ground for error in the sentencing context is the cross-reference to Young's offense, which is considered below.

Ross challenges the enhancement for obstruction of justice under section 3C1.1.

### A.

We find that the district court properly used the cross-reference to Young's pre-guidelines offense in determining the sentences.[61] It is now well-established that "pre-Guideline conduct may be considered in arriving at the Guideline offense level." *United States v. Parks,* 924 F.2d 68, 72 (5th Cir.1991). Moreover, all of the defendants' conduct occurred after the guidelines were in place. Thus, there are no *ex post facto* concerns here, as the punishment was set in place prior to any culpable acts.

An analogous situation is presented when guideline penalties cross-reference to state law violations, even though such violations consist of conduct that is outside the scope of the guidelines. Other circuits have upheld the state violation cross-reference. *See United States v. Willis,* 925 F.2d 359, 360–62 (10th Cir.1991); *United States v. Smith,* 910 F.2d 326, 329–30 (6th Cir.1990). As the Tenth Circuit has noted, "the cross reference merely allows the sentence for the charged crime [that falls under the guidelines] ... to reflect the reality of the crime." *Willis,* 925 F.2d at 361. Here, the defendants have offered no other way in which a court could take into account the seriousness of the underlying offense.

Collins points to the fact that Young, who was sentenced under the pre-guidelines sentencing scheme, received only three years' imprisonment, whereas Collins was sentenced to almost seven years under the guidelines. But there is no inequity here: Young committed a pre-guidelines offense; Collins did not.

61. We apply a *de novo* standard of review, as this issue involves an interpretation of the guidelines. *See United States v. Lara-Velasquez,* 919 F.2d 946, 953 (5th Cir.1990).

62. Seven of the eight circuits that have considered whether the enhancement impinges on the right to testify agree that it does not. *See United States v. Batista–Polanco,* 927 F.2d 14, 22 (1st Cir.1991); *United States v. Acosta–Cazares,* 878 F.2d 945, 953 (6th Cir.), *cert. denied,* 493

### B.

Ross objects to the district court's enhancement under section 3C1.1 for obstruction of justice. Under this section, the court may increase the offense level by two if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense...." Application note 1 states that "[t]his provision is not intended to punish a defendant for the exercise of a constitutional right." It adds that "[a] defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury) ... is not a basis for application of this provision." In applying this provision, the court is instructed to evaluate alleged false testimony "in a light most favorable to the defendant."

Ross argues that the enhancement placed an impermissible burden on his right to testify. Yet, as noted above, the guideline plainly contemplates that a district court may use the enhancement when "a denial of guilt under oath ... constitutes perjury." Indeed, "there is no protected right to commit perjury." *United States v. Grayson,* 438 U.S. 41, 54, 98 S.Ct. 2610, 2617, 57 L.Ed.2d 582 (1978). The guideline section is tailored to protect a defendant's right to testify, while still permitting sentencing courts to take into account the fact that the defendant perjured himself. As we recently have held, "[t]hough the court may not penalize a defendant for denying his guilt as an exercise of his constitutional rights [including the right to testify], enhancement based upon perjury is permissible." *United States v. Goldfaden,* 959 F.2d 1324, 1331 (5th Cir.1992).[62]

U.S. 899, 110 S.Ct. 255, 107 L.Ed.2d 204 (1989); *United States v. Barbosa,* 906 F.2d 1366, 1369 (9th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 394, 112 L.Ed.2d 403 (1990); *United States v. Keys,* 899 F.2d 983, 988 (10th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 160, 112 L.Ed.2d 125 (1990); *United States v. Matos,* 907 F.2d 274, 276 (2d Cir.1990); *United States v. O'Meara,* 895 F.2d 1216, 1220 (8th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 352, 112 L.Ed.2d 316 (1990); *United States v. Wallace,* 904 F.2d 603, 604–05

■ Ross also contends that the court failed to evaluate his testimony "in a light most favorable" to him in accordance with the application note. In *United States v. Garcia*, 902 F.2d 324, 326 (5th Cir.1990), we suggested that "this note does not require the sentencing court to believe the defendant, but 'simply instructs the sentencing judge to resolve in favor of the defendant those conflicts about which the judge, after weighing the evidence, has no firm conviction.'" (Citation omitted.) In this case, the district court apparently had no conflicts to resolve, as it noted that "from the evidence which [it] heard" during trial, "an application of the adjustment" for obstruction of justice was "appropriate."[63] We find no error.

## XIII.

In summary, we refuse to create a "federal judge exception" to the general rule that reasoned suspicion is not required before federal authorities may commence an investigation. We also conclude that the government's conduct was not so outrageous in this case as to constitute a due process violation. In addition, we find that the defendants failed to show that they were victims of selective prosecution.

We hold that the government's commencement of a telephone survey did not violate the defendants' due process rights. Nor were the defendants deprived of a fair and impartial jury because of juror misconduct. We also conclude that the government did not violate *Batson* in exercising its peremptory strikes. In addition, we find no violation of *Miranda*, as the defendants were not in custody when they made the incriminating statements.

Finally, we conclude that the prosecutor did not improperly comment on Collins's failure to testify, nor did he improperly comment on Collins's pre-arrest silence. In addition, we find that the wiretap application was sufficient, as was the court's entrapment instruction. The district court did not err in sentencing the defendants. The judgments of conviction and sentence therefore are AFFIRMED.

---

(11th Cir.1990) (per curiam). *But see United States v. Dunnigan*, 944 F.2d 178, 183 (4th Cir. 1991), *cert. granted*, — U.S. —, 112 S.Ct. 2272, 119 L.Ed.2d 199 (1992).

*Dunnigan* distinguishes *Grayson* on the ground that that case addressed a pre-guidelines realm in which the sentencing court had broad discretion to be lenient. 944 F.2d at 184. We find that this is not a distinguishing factor, as the guideline plainly requires that the court evaluate the allegedly false testimony in the light most favorable to the defendant. In addition, the guideline is not designed to punish a

defendant for exercising his constitutional right; nor is it designed to apply to denials of guilt "other than a denial of guilt under oath that constitutes perjury."

**63.** Thus, the court based the enhancement not upon "the mere fact that the jury returned a verdict of guilty," as Ross suggests, but rather upon its own evaluation of the evidence. *See United States v. Benson*, 961 F.2d 707, 709 (8th Cir.1992) (enhancement may not be based "solely upon [the defendant's] failure to convince the jury").